**David FRANCO, Appellant,**

v.

**Barbara Ann FRANCO, Appellee.**

**No. 08–00–00011–CV.**

Court of Appeals of Texas,
El Paso.

Feb. 14, 2002.

320

Russell D. Leachman, Diamond Rash Gordon & Jackson, P.C., El Paso, for appellant.

Gary A. Aboud, Chris Bradley, El Paso, for appellee.

Before Panel No. 1: LARSEN, McCLURE, and CHEW, JJ.

### OPINION

ANN CRAWFORD McCLURE, Justice.

This is a relocation case. David Franco appeals the trial court's decision to lift the domicile restriction contained within the parties' final decree of divorce which required the residence of their twin daughters to be maintained in El Paso County, Texas. We affirm.

**FACTUAL SUMMARY**

Barbara Ann Franco, now Barbara Ann Pulcini, and David Franco were divorced on January 26, 1996.

### Provisions of the Final Decree of Divorce

The decree itself is a bit unusual. The parties were designated as joint managing conservators of their twin daughters, Alicia and Olivia. Neither parent was denominated as the joint managing conservator having the right of primary possession, although the decree specified that Barbara "shall have the custody and possession of the children at all times during the time [David] does not have custody and possession pursuant to this order." The possession order provided:

> IT IS ORDERED AND DECREED that [David] and [Barbara] shall have alternate possession of the children every other week from 6:00 p.m. Friday to 6:00 pm. [sic].

This provision was immediately followed by a standard possession order which provided that David would have possession at all times mutually agreeable and, absent an agreement, during the times set forth in the standard possession order, which tracks the provisions of the Texas Family Code in existence at the time. It includes the provisions for parents residing 100 miles or less apart as well as the provisions for parents residing more than 100 miles apart. And, as we have already noted, the decree provided that the "county of residence of the children shall be El Paso County, Texas, and the parties are enjoined from removing the children from El Paso County, Texas, for the purpose of changing the residence until altered by further order of the court of continuing jurisdiction." Finally, the decree dictates the following child support orders:

> The Court finds that no child support provisions shall be DECREED AND ORDERED in this Decree. IT IS ORDERED AND DECREED if [David] moves over 100 miles from [Barbara], then an amount of child support will be payable and determined at that time.

Since the divorce, the parties have alternated weeks of possession and the provisions of the standard possession order have been largely ignored.

David is a special agent with the Federal Bureau of Investigation. At the time of the divorce, he had been with the FBI for three years and because of his concern that he might be transferred away from El Paso "to an environment that wasn't conducive to the kids," the decree provided for long distance visitation.

Both Barbara and David are from New Orleans, Louisiana, and their respective families continue to live there. The record is replete with references to David's desire to move back to New Orleans. Barbara claimed that David planned to move to New Orleans soon after the divorce and that this was the reason for the long distance visitation provisions. At one point, David testified that he had not requested a transfer to New. Orleans since 1995, but later in the proceedings, he testified that he had not removed his name from the transfer list until 1998. Nevertheless, even after the divorce, it was "absolutely" his intention that he, Barbara, and the twins would move back to New Orleans and the girls would continue to have access to both parents. Given his seniority at the time of trial, if he were to put his name on the list, it would take six months to a year for a transfer to New Orleans to come through.

### The Modification Pleadings

In her original petition in suit affecting the parent-child relationship filed April 1, 1999, Barbara sought a continuation of the joint managing conservatorship, but sought the designation as primary caretaker with David having only "standard visitation rights." She also sought the imposition of child support. David responded with a counter-petition in which he requested that he be appointed the primary joint managing conservator and that Barbara be allowed visitation in accordance with the standard possession order. He also sought child support. In Barbara's first amended petition filed September 3, 1999, she requested authorization to relocate to San Antonio, specifically pleading, "[Barbara] secured employment in San Antonio, Texas that enhances her career as well as creating a better environment for the children." On November 12, 1999, shortly before trial began, she filed a second amended petition in which she alleged:

> [Barbara] has recently been married to Joseph Pulcini, who currently resides in San Antonio, Texas and is unable to relocate to El Paso. Furthermore, [Barbara] has secured employment with Southwestern Bell Wireless in San Antonio, Texas, which provides [Barbara] with a greater salary and benefits package. The move would be in the best interest of the children to be with their mother, and the environment for the children in San Antonio would greatly enhance the social and educational growth of the minor children.

We turn now to the evidence presented on the grounds raised in the various pleadings: (1) the remarriage of the parties and their anticipated or actual relocation; and (2) Barbara's current employment situation and pending employment opportunity.

### David's Remarriage

David married Carla Hoffer in June of 1998 and he claimed that Barbara was upset about his remarriage. She made a variety of remarks, including "what did Carla have that I didn't have," "I need to know when you're going to get married because I need to know when to start panicking," and "isn't that convenient, you're marrying yourself a baby-sitter." Problems developed over the Thanksgiving and Christmas schedule that year and when David had to be out of town for three weeks, Barbara insisted that the girls be with her during David's customary week, rather than spending the time with Carla.

She then expected David to pay the day care expenses for the additional time the children were with her. When Barbara learned from the girls that Carla was pregnant, she told David that she intended to take both girls as a tax deduction rather than split the deductions with him, as she had historically done.

Carla has two sons from her prior marriage to Craig Hoffer. Although the divorce decree granted Hoffer visitation with the boys on the first and third weekends of the month, by agreement, he has the boys each and every weekend. In July of 1998, shortly after David and Carla's wedding, the older boy told Hoffer that the family planned to move to New Orleans. Within a week, Hoffer called Carla to discuss the situation. Barbara's name did not come up in the discussion concerning the family's intention to move.[1] In October 1998, Hoffer filed suit seeking a domicile restriction which would prevent Carla from moving with the boys. In January 1999, Barbara paid Hoffer an unexpected visit. They talked for roughly an hour, during which time Barbara expressed her concerns that David and Carla planned to move to New Orleans, that she didn't want the girls to move to New Orleans without her, and that if David moved, she needed to obtain child support. They had several conversations over the next few months. Ultimately, Hoffer's concern over his sons' entanglement in an escalating custody battle caused him to resolve the suit. Temporary orders were entered which allowed the children to relocate to New Orleans and provided that a 90–day transition period would begin on the date of the move. Child support would terminate during the transition period, the wage withholding order would be revoked, Hoffer would visit with the children every weekend, and he would bear 100 percent of the travel expenses. At the end of the 90–day transition period, a final hearing would be conducted. Although plans to move had not yet been formalized, according to Hoffer, the move was to take place "possibly [in] two years." Carla admitted that she had represented to the court that she would move to New Orleans within six months, even though she didn't really know when David's job transfer would come through. These recitations are in direct contrast to David's trial testimony that he removed his name from the transfer list in 1998.

In February 1999, Barbara's attorney wrote David a letter suggesting Barbara perceived a communication breakdown, was concerned by the antagonism from David and Carla on visitation issues, believed David may be relinquishing joint communication duties to Carla, and that while Barbara was pleased he had remarried, "the situation currently is not necessarily friendly between the mother and stepmother." The letter suggested changes to the visitation schedule which would allow both parties access to the children weekly rather than every other week. At trial, Barbara admitted that she retained counsel right after she learned about Carla and that she was concerned

---

1. This is significant in light of David's trial testimony:

> Q: If the Court were to make you the primary conservator in connection with this case, would you move the children to New Orleans even today? If the Judge says you have primary rights to determine residency, would you move to New Orleans without their mother?
>
> A: No. Absolutely not.
>
> Q: I mean, if you did that and she was living here under that circumstance, do you think that that would be in their best interest?
>
> A: To move them away from their mother?
>
> Q: Even to New Orleans where all their family is away from their mother?
>
> A: No, no. I would never do that.

how the marriage would affect her relationship with the girls. Although she didn't offer a specific proposal before she filed the modification action, she wanted to change the week on/week off arrangement to provide weekly and more frequent contact with both parents. She was considering overnight Wednesday access because there were "a lot of changes" at David's house and the girls had told her that a week away from their mother was too long. She admitted to changing the tax deductions unilaterally and to showing up at Hoffer's home to coordinate lawsuits because she believed David planned to move to New Orleans.

### Barbara's Remarriage

The circumstances and timing surrounding Barbara's remarriage were hotly contested at trial. Barbara and Joe Pulcini began dating in February 1998. Joe is a 39–year–old physician in the United States Army and at the time, he was the chief clinical pathologist at William Beaumont Army Medical Center in El Paso. In early April or May of 1999, he and Barbara were discussing marriage and by then she knew he would likely be moving to San Antonio. In June, he was transferred to Brooke Army Medical Center, where he will probably be stationed for at least three years. He can pursue his specialty certification in pathology only in San Antonio, and although it is not guaranteed, it is likely he can stay there the remainder of his military career. Because they were both of the Catholic faith, the couple wanted to be married in the church. Due to Barbara's divorce, annulment proceedings were necessary and the marriage plans were delayed as a result. The annulment hearing was conducted on October 1, 1999. Barbara was told by the presiding priest at the conclusion of the tribunal hearing that she was free to remarry. They married in a civil service before a justice of the peace on October 23, 1999, planning to remarry in the church at a later date. At the time of trial, they believed the annulment was final, although no church wedding had been scheduled and the couple had not registered for the requisite "precana" program which could take up to six months. They married not knowing whether the children would be able to move to San Antonio. Barbara did not tell David or the children of the marriage beforehand [2] and, surprisingly, she and Joe had never even discussed the possibility that the court might not allow the children to relocate. During her deposition a few weeks before trial, Barbara testified that she didn't know what she would do if the court denied the relocation. At trial, she testified that she did not plan to divorce Joe if the children were not allowed to move, but that she would probably remain in El Paso as well, although she had not discussed that possibility with Joe either. When finally pressed by the trial court as to her intentions if the relocation were denied, Barbara testified that she didn't have a plan, "but I can't leave my kids. I know it would be devastating for them." Other than weekend visits, the couple had not lived together as husband and wife since the date of their marriage.

David characterized the marriage within thirty days of trial as a calculated move designed to manipulate the relocation. He emphasized that during her deposition, Barbara testified that the reason for the timing of the marriage was to get on the list for army housing, but in fact the couple was not planning on living on base and

---

**2.** Barbara testified that she and David had agreed not to, and were enjoined from, discussing relocation with the girls, and if they had been informed of the marriage, questions of where they would live would certainly arise.

had located a home they wanted to rent. There was also a debate over the status of the annulment proceedings, an issue we detail more fully in our discussion of Point of Error No. Three below.

### Financial and Employment Issues

At the time of the divorce, David was earning a base salary of $42,641 and at the time of trial, his salary was $76,000. He "never had a clue" as to what Barbara was earning during the marriage.[3] Because possession of the children was evenly divided, and because he had assumed $10,000 in credit card debt which included Barbara's college tuition, the decree did not provide for any child support obligations. Post-divorce, David never offered Barbara additional financial assistance despite the disparity in their earnings.

Barbara is an accountant and since September 1996, she has been employed by SC Group, Inc., referred to throughout the record as Security Capital. Recently promoted to team leader, she works in the business services group, which is part of the accounting department. Barbara testified that she had concerns over her job security and that 28 percent of the employees had been laid off between January and October of 1999. The work force had been scaled down to 200 and was anticipated to be cut down to 155 in 2000. Seventy-five percent of her workload was related to a company called Urban Growth Property Trust. She anticipated losing them as a customer in January 2000.

When Barbara first felt that her job was at risk, she discussed with David whether he would be willing to help her financially with the children if she lost her job. He told her "point blank that he would not. I have to support myself." David never denied making the statement. Consequently, she began looking elsewhere for work,[4] concentrating on El Paso, Houston, New Orleans[5] and, ultimately, San Antonio. She received an offer from Southwestern Bell Wireless in San Antonio in August 1999 and spoke to David about her relocating. He told her that he would not allow her to move:

We spoke for quite a while. He just, basically, insisted that I move to New Orleans if I needed to move. I spoke to him about my concerns financially if I were to lose my job. I asked him if he would offer to help me support the children if I lose my job. He refused. He offered, as a solution, I could move to New Orleans and live with my parents.

Paul Szurek, the managing director of Security Capital, testified that the company was in a transitional period due to automation and software integration and that a number of employees had been laid off. The work force had been reduced from 290 to 180. The company was losing Urban Growth Properties as a customer due to a merger but they would try to move Barbara to another company position. He estimated her chance of keeping her job at 80 percent, but he did not know if that would be true in six months. While he characterized her job security as "very high" and noted that she was not "at risk,"

---

3. The record does not precisely indicate Barbara's income at the time of divorce. However, if she earned the same wages she earned for the calendar year 1998—$21,308—David's income at divorce was twice that of hers.

4. Barbara testified that she started looking for another job about a year before trial, which would have been in November or December of 1998.

5. As we have already noted, by January 1999, Barbara had received information from the girls and Craig Hoffer that David and Carla were planning a move to New Orleans, and in fact, Carla had represented as much in court.

he understood that employees worry about "where the other shoe is going to drop" and would rather move on. Indeed, during trial, Barbara learned that her immediate supervisor, the financial comptroller, was leaving the company.

Szurek also testified concerning the company benefits package. Barbara had life insurance coverage equal to her annual salary, a "better than average" medical plan which required employees to pay 25 percent of the premium, a 401(k) plan featuring an employer contribution of company stock equal to 50 percent of the employee's contribution up to 6 percent of her annual salary, stock options, seven sick days per year, "a standard menu of holidays," two to four weeks vacation tied to her tenure, one personal day per year, and a potential for bonuses. The bonuses were traditionally given to employees at the level of vice president and above, as well as to some team leaders, although Szurek did not know whether Barbara was in this category.[6] Tuition reimbursement was unavailable. The stock options for 1999 were granted down to the team leader level and varied between 500 and 1500 shares at $15 to $16 per share; the stock price at the time of trial was 13⅛. Szurek did not testify whether Barbara was granted any options, although he did mention that her promotion to team leader had been "fairly recent."[7] Her base salary was $46,000. He speculated that she could receive a salary adjustment of 4 percent.[8]

Patricia Erb is the director of human resources for the greater Texas region of Southwestern Bell Wireless, a subsidiary of SBC, Incorporated, which offers cellular service, wireless services, equipment, and accessories. Erb testified concerning the employment offer to Barbara as well as the benefit package. Barbara's title would be manager of financial analysis and the position was not available anywhere but San Antonio, which is the corporate headquarters. Her starting salary would be $46,000 with an annual bonus of 11¼ percent of her salary. Medical coverage is offered at a low price to management employees.[9] She will receive, without cost to her, total disability insurance of 100 percent of her salary for a period of fifty-two weeks. Other benefits include tuition reimbursement up to $10,000 per year, seven days of sick leave, seven personal days off, ten paid holidays, and two weeks of vacation during her first year of employment. Stock options are uniformly offered to management based on the performance of the company, and while they are not guaranteed, options had been granted for the past four years. Erb's recollection was that for 1998, an employee with a salary of approximately $50,000 received 300 options, which as of the date of her deposition, were trading at $50.88 per share. That year, there was also a stock split which generated a total of 600 option shares. To enable the employees to exercise their options, the company lends the employee the purchase money. It also provides base salary market adjustments, formerly called merit increases, which "traditionally come in at approximately four percent of salary."

6. Barbara testified that she received a $1,000 bonus in 1998.

7. Barbara testified that she had been promoted in June 1999 and that her annual salary had been increased to $46,000 at that time, up from $21,308 in 1998. She had never received stock options during her employment with Security Capital.

8. Barbara pegged a potential pay raise at 2 percent.

9. Specifically, Erb testified that each month, she "pay[s] $31 for incredible coverage. SBC is known for its benefits."

### The Modification Order

The trial court granted the motion to modify, retained the joint managing conservatorship, ordered that Barbara have the right to establish the primary residence of the children, entered a standard possession order, ordered that David pay child support of $993 per month for the months of January through May and the months of August through December, and ordered that Barbara pay child support in the amount of $790 per month for the months of June and July. David filed a request for findings of fact and conclusions of law on January 14, 2000, the very day the order at issue was signed by the court. He filed a notice of past due findings on February 15, 2000. By letter dated February 21, 2000, the trial judge, the Honorable Bonnie Rangel, advised counsel that she had not been notified of the request for findings until February 17, when she received the past due notice. We first note that presentment to the district judge has not been required since the Supreme Court's ruling in *Cherne Industries, Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989). Rule 296 was amended the next year to provide that it is the express duty of the court clerk to call the request to the attention of the judge. *See* TEX.R.CIV.P. 296. Secondly, Judge Rangel correctly noted that the notice of past due findings was untimely. Rule 296 requires an initial request for findings to be made within twenty days after judgment is signed; Rule 297 requires the court to file its findings within twenty days of the initial request. If the court fails to timely file the findings, the requesting litigant must file a reminder request within thirty days of the date the original request was filed. *See* TEX.R.CIV.P. 296, 297. Because David's notice of past due findings was not filed until February 15, it was two days late and therefore untimely. While the due date of February 13 fell on a Sunday, Rule 4 would have extended the filing deadline only until Monday, February 14. *See* TEX.R.CIV.P. 4. Consequently, this appeal proceeds without the benefit of formal findings.

### IN CAMERA INTERVIEW

In Point of Error No. One, David complains that the trial court exceeded its statutory authority in conducting and relying upon an *in camera* interview of the twins which deprived him of due process of law. He admits that discussions concerning the interview took place in chambers and off the record, but that the trial court was well aware of his objections. We disagree and conclude that any error has been waived.

A review of the record before us reveals that the issue of an interview first arose during the morning session of December 2, 1999, which was the second day of trial: [10]

Mr. Phil Franco: [11] We have two short witnesses. We expect to finish before lunch time.

Mr. Aboud: Great.

The Court: And then Mr. Leachman, did you tell Mr. Franco I did request the children?

Mr. Leachman: It's Ms. Pulcini. You're going to present them at 4 o'clock.

The Court: Thank you. We're in recess.

During the afternoon session after Barbara rested her case, David moved for a directed verdict, requesting the court to enter judgment denying the modification

10. Trial began on November 24, 1999, the day before Thanksgiving, and recessed for the holidays.

11. Philip Franco, David Franco's brother, participated as co-counsel at trial.

because Barbara had failed to establish that the proposed modification was in the best interest of, and would be a positive improvement for, the children. The trial court denied the motion because she had not heard all of the evidence since she wanted to hear the testimony of Carla Franco and she had not talked to the children. Finally, the following exchange occurred, and we repeat it in its entirety:

> The Court: Thank you very much, Mr. Leachman. As I told the parties as relation [sic], it's a difficult, difficult issue. It's even—it's even much more difficult because—you have on both sides you have parents and I'm including Carla on your side and I'm including the doctor on your side. You've got parents who are loving, and caring, and nurturing, and loving, and obviously, truly involved with the children. And that was the reason, once I heard from Mr. Franco and once I heard from Ms. Pulcini, that I determined it was best to speak to the children, because we do have such wonderful parents. And you're right, Mr. Leachman, I mean, this is all about the children.

> Mr. Leachman: That's why the children have got to be spoken to.

> Mr. Leachman: Okay.

> The Court: So with that being said, I am going to speak with them at 4 o'clock.

> Mr. Leachman: The arrangement, we are going to—they will be here at 4 o'clock; is that correct?

> Mr. Aboud: That's correct.

> The Court: Counsel, I don't anticipate making a decision today. I don't because I'm returning very late. I've got a 2 o'clock, 1:30 motion, 1 o'clock motion to compel and a revo[cation], and then I've got you all, 4 o'clock again. So I will be out of town, so

it—you all need some—some decision and some closure and some direction in this case. And I can understand that, so I'm not going to sit on it for two weeks, but we will make our decision next week. I don't think we need to come back, Mr. Franco. No New Orleans. Basically, do a findings and the order drafted accordingly. Okay. Very well. Anything else, Mr. Leachman? Mr. Aboud?

> Mr. Aboud: Nothing.

> Mr. Leachman: Only, Judge, I know you're going to have an in camera inspection. Did you have plans to have the court reporter present for that?

> The Court: I generally don't.

> Mr. Leachman: Okay.

> The Court: I don't—are you requesting that and then do you have any objection? I mean—

> Mr. Leachman: I think that the—I don't know what the—I think the rule says, basically, that you can have the lawyers present, if you want, and you indicated to us you didn't think you wanted that. In lieu of that, then I think you—the rule, you can have a court reporter present.

> The Court: So you have any objection to the court reporter present [sic]?

> Mr. Aboud: I don't have an objectioon [sic].

> The Court: Okay. Then the court reporter will be present taking the testimony. And what I do and there's nothing in the rules that require, well, as far as for appeallate [sic] purpose, I guess, it is there because generally what the children tell me, I'm putting them in a precarious situation, you know, that all right—all right, in a very precarious situation. And what I preface these conversations and dis-

cussion with the children in chambers is 'Your mommy and daddy are not going to know what you're telling me.' So my fear is that based on you all have your right to appeal, but then what I—it's not going to be confidential. So that's okay. And I understand the position you're in and you've got to vigurously [sic] defend it, defend your client Mr. Leachman, if that's what you want to do.

Mr. Leachman: I understand it counsel, from the—you're telling me you can seal it?

The Court: Yes.

Mr. Leachman: And we certainly have to object.

The Court: Then what's the purpose of having the court reporter there, Mr. Leachman? Thank God you're here to help us coordinate. Thank God we brought our reinforcements. If I do seal it, what's the purpose of having the court reporter? If you have sealed it, the Court of Appeals—the parties will not and the court reporter—the Court of Appeals will review it in camera, just as you—okay? Okay.

Phil Franco: May I, Your Honor?

The Court: Yeah, you may, Mr. Franco.

Mr. Franco: First of all, thank you very much for the hospitality, I appreciate it very much. You know, I don't practice here ordinarily and you made it very easy. From my point of view, whatever you think is best for those children, whether that meeting with you is what should be done. If you think having someone else in there with you, be the court reporter [sic], then don't have them.

Mr. Leachman: If you think it is not a problem and there is a need for it to be preserved for somebody to take a look at in the event that that makes

your decision or is the reason for your decision, then have the court reporter present, but I appreciate it. I'm willing to defer to you and you can make a decision after you're in there with them.

The Court: That will give us, I hope, the likeable—I'm not second-guessing you, but if I can do it, Mr. Leachman, where the parties will not be—mom and dad and counsel will not know what the children told me. I have no problems with the court reporter because two things: I need to—I need—there has been a request made by an attorney of a party and I cannot take this lightly in terms of what I think should or shouldn't be done. With that request being made for appellate purposes, I really do think we need to preserve that testimony, Mr. Franco.

And we all have to look for, you know, look to appeal, if indeed one of you doesn't like what I say, and it's going to happen, one of you is not going to like what I do or say. So with that being said and with the request being made, I think for the protection and for the benefit of all parties concerned, Mr. Franco, I think [it] may be a good idea to have the Court reporter there, sir.

And I will tell—I mean, these children, I'm sure, are very bright children and I'm going to tell them they're taking down the testimony. And just for appellate purpose, but I'm going to make sure if it's not in there, I think I can make an order in—in saying it's sealed and the parties and attorneys are not going to be provided. It's purposely for appellate purpose for review.

Mr. Leachman: That's fine. That's right.

The Court: Anything further? Anything further, Mr. Aboud?

Mr. Aboud: Nothing.

The Court: Thank you. Best of luck to all of you and I will be rendering my decisioon [sic] sometime next week. Court's in recess and you all may be excused.

Mr. Aboud: Thank you, Judge.

Mr. Leachman: Thank you, Your Honor.

Judge Rangel then interviewed Alicia and Olivia in chambers from approximately 4:15 until 5:30 p.m.

The attorneys appeared again on December 14, 1999. After an informal discussion in chambers concerning Judge Rangel's ruling, Leachman requested that the court unseal the record of the interview and that he be allowed to reopen the evidence based upon information the children had told their father since the interview which led him to believe Barbara had talked to the children about the move to San Antonio in an effort to manipulate their comments to Judge Rangel. The following exchange occurred on the record:

Mr. Leachman: Well, my view on it is this, Judge, and you'll recall from our prior meetings and I don't know if these were all on the record or not, but if they weren't, I'd ask you to recollect that in chambers I had concerns about having the children come and—

The Court: To speak with me period.

Mr. Leachman:—to speak with the judge period.

The Court: That's correct.

Mr. Leachman: And obviously if that sort of thing were, you know—and when we entered into the case you said you didn't know whether you'd need them for sure or not.

The Court: That's correct.

Mr. Leachman: And I believe you made that decision after the conclusion of evidence because, as you've previously stated, it was important to your decision. My point is, Judge, is that this is a case that we spent two full days trying; we did a lot to prepare for. One thing that we did not prepare for is the testimony of the children, and we had no discussions with them whatsoever. We know that what they said was critical to what you decided. We believe that there have [sic] been some influence on them. No psychologist or psychiatrist had an opportunity to evaluate or talk with these children as is customary in these kinds of cases when they're going to testify or when they're going to be interviewed. And because none of those things occurred and because it is so important, I felt like at the time that you were going to interview them, at the very least, we needed to make a transcript so we had some ability to evaluate that at a subsequent date if we believed that was the problem. And without unsealing it we don't have an ability to do that.

I guess that's—you know, they aren't subject to cross-examination. They aren't subject to—I mean, even us having any knowledge or ability to determine what might have been said, and if they were manipulated in connection with the process and we can't even see it, we can't even attempt to ferret that out, Judge. So that's the reason that we think it's important it be unsealed.

[Argument of Mr. Aboud deleted].

The Court: I need to tell you, these kids unequivocably [sic] did not know why they were here. They gave me a totally different reason why they were here, truly, Mr. Leachman. So any

concerns you have about manipulation and any indication on one party's part as to this is what it's all about and this is why and you better say this, as I reassured you in my chambers when you did have some questions and some concerns about me speaking to the children, I told you I'm leaning towards that but I haven't decided yet because, of course, I hesitate and don't involve the children unless I truly do need their help, okay. And I thought it was necessary in this case. As I assured you off the record and I'm going to assure you on the record, I asked them questions about what happens at your home when this, and who cooks and who takes care of you and who does this for you and who does that for you, and those were the kinds of questions. And basically I took these children through their lifestyle when they're with mommy and compared those to when they're with daddy. Those questions were not—I did not ask the children, Do you want to be with mommy or daddy? Do you want ... I mean, no. These were questions, who picks you up and then what do you do and then where do you go, and where do you—I mean, those were the kinds of questions, just to get an insight as to the lifestyle of these children with mommy versus daddy.

So as far as your concern about manipulation, as far as your concern about these children knowing why they were here, they gave me a totally different reason as to why they were here.[12] I was even a little surprised. I anticipated that these children knew why they were here. No. No, they gave me a totally different reason why they were here to talk to me. So those concerns truly are not founded, sir, based on my conversations with these children, so I am going to go ahead and deny your motion to reopen based on manipulation or newly discovered evidence or whatever the children may have told Mr. Franco.

It is clear from these excerpts that concerns were voiced in chambers regarding an *in camera* interview. It is equally clear that the discussion in chambers occurred *before* Leachman told the court in the exchange just before the interview, "That's why the children have got to be spoken to" and before Phil Franco advised the court, "From my point of view, whatever you think is best for those children, whether that meeting with you is what should be done."

■ In his reply brief, David contends that Leachman's comment was actually posed in the form of a question rather than an affirmative statement. He also points to the following objection:

> Mr. Leachman: I understand it counsel, from the—you're telling me you can seal it?
>
> The Court: Yes.
>
> Mr. Leachman: And we certainly have to object.

He contends this objection related to the *in camera* interview. On the contrary, it appears to us to be an objection to sealing the reporter's record of the interview. Moreover, he wholly fails to address the statements made by his attorney/brother inviting the court to meet with the girls if the judge thought it best. Finally, he does not complain on appeal of Judge Rangel's

---

12. Both children said they were talking to the judge so she would know how they feel about their parents being divorced.

determination to seal the record[13] nor of her denial of his motion to reopen the evidence. Because we conclude that David has failed to preserve error, we overrule his first point of error.

### POSITIVE IMPROVEMENT

In his second point of error, David complains that the trial court abused its discretion in modifying the terms and conditions of the joint managing conservatorship because Barbara presented no evidence that the modification would be a positive improvement for the children. Where these two standards of review overlap, as they frequently do in family law cases, we employ a hybrid analysis.

### *Standard of Review*

In considering a legal sufficiency or "no evidence" point, we consider only the evidence which tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Jenkins v. Jenkins,* 16 S.W.3d 473, 477 (Tex.App.-El Paso 2000, no pet.). If any probative evidence supports the jury's determination, it must be upheld. *Jenkins,* 16 S.W.3d at 477. In an appeal from a bench trial, findings of fact are the equivalent of jury answers to special issues. *Lindsey v. Lindsey,* 965 S.W.2d 589, 591 (Tex.App.-El Paso 1998, no pet.). The reviewing court cannot substitute its conclusions for those of the trial court if there is sufficient competent evidence of probative

force to support the trial court's findings. *Id.*

A trial court's order modifying a joint managing conservatorship will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *Jenkins,* 16 S.W.3d at 477. The test for abuse of discretion is whether the trial court acted in an arbitrary and unreasonable manner, or whether it acted without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The mere fact that a trial judge may decide a matter within her discretionary authority in a different manner than an appellate justice in a similar circumstance does not demonstrate that an abuse of discretion occurred. *Downer,* 701 S.W.2d at 241–42; *Jenkins,* 16 S.W.3d at 477. The question of conservatorship of a child is addressed to the sound discretion of the trial court when it sits as trier of fact. *Id. citing Jeffers v. Wallace,* 615 S.W.2d 252, 253 (Tex.Civ.App.-Dallas 1981, no writ). The trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.[14] *Id.* Thus, an abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Jenkins,* 16 S.W.3d at 477, *citing Valdez v.*

---

13. By order dated January 27, 2000, we ordered the reporter's record from the *in camera* interview unsealed for the limited purpose of briefing the issues on appeal.

14. We find a description by the Beaumont Court of Appeals to be particularly apropos: A trial judge is much like a conductor of an orchestra in that he or she, during trial, is best able to read from the score, hear the sounds and determine individual performances. When these matters then come before an appellate court, the ability to personally observe is lost and we are left with only the written notes.
 *Warchol v. Warchol,* 853 S.W.2d 165, 169 (Tex.App.-Beaumont 1993, no writ).

*Valdez,* 930 S.W.2d 725, 731 (Tex.App.-Houston [1st Dist.] 1996, no writ).

Most of the appealable issues in a family law case are evaluated against an abuse of discretion standard, be it the issue of property division incident to divorce or partition, conservatorship, visitation, or child support. *Jenkins,* 16 S.W.3d at 477. In some instances, the abuse of discretion standard overlaps the traditional sufficiency review. *Id.* In *Lindsey,* we addressed the conflict between the traditional sufficiency review and the abuse of discretion standard in the context of a child support modification and determined that once it has been determined that the abuse of discretion standard applies, an appellate court should engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *Lindsey,* 965 S.W.2d at 592. The traditional sufficiency review comes into play with regard to the first question; however, our inquiry cannot end there. *Id.* We must proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* Stated inversely, we must conclude that the trial court's decision was neither arbitrary nor unreasonable. *Id.; see also, In the Interest of De La Pena,* 999 S.W.2d 521 (Tex.App.-El Paso 1999, no pet.).

### Modification Standards Under Tex.Fam.Code Ann. § 156.202

Historically, Texas law has tried to ensure stability and continuity for children by imposing significant hurdles to modifications of managing conservatorship. *Jenkins,* 16 S.W.3d at 478. When the Family Code was enacted in 1973, modification of sole managing conservatorship was measured by the now familiar test of a material and substantial change in circumstances, coupled with a best interest test. *Id.* In 1975, an additional prong was added, requiring a finding that retention of the existing managing conservator would be injurious to the welfare of the child. *Id.* Twenty years later, the "injurious retention" element, as it had come to be known, was abandoned. *Id.* Currently, Section 156.101 provides that a court may modify a sole managing conservatorship if the circumstances of the child, sole managing conservator, or possessory conservator have materially and substantially changed, and the appointment of a new sole managing conservator would be a positive improvement for the child. *Id.*

■ Joint managing conservatorship was not authorized by statute absent the agreement of the parties until 1987. *Id.* The standard for modifying a joint managing conservatorship has always been less stringent, allowing a modification in the terms and conditions of the joint managing conservatorship upon a showing of a material and substantial change in circumstances or upon a showing that the decree has become unworkable or inappropriate under the circumstances, and upon a showing that the modification would be a positive improvement for and in the best interest of the child.[15] *Id.; see also* Tex.Fam.

---

15. Modification from a joint managing conservatorship to a sole managing conservatorship may be premised on additional elements. The petitioner may show that the child's present living environment may endanger the child's physical health or significantly impair the child's emotional development; there has been a substantial and unexcused violation of the terms and conditions established in the existing conservatorship order; *or* the circumstances of the child or one or both of the joint managing conservators have so materially and substantially changed since the rendition of the order that it has become unworkable or inappropriate under existing circumstances; *and* the ap-

CODE ANN. § 156.202 (Vernon 1996). On appeal, David challenges only the legal sufficiency of the evidence to support a finding that the modification would be a positive improvement for Alicia and Olivia.

We have already recounted the testimony concerning Barbara's employment status, her marriage to Joe, and David's marriage to Carla. We next address the testimony regarding the environment the children enjoy in El Paso and the environment Barbara plans for them in San Antonio.

### The El Paso Environment

#### The Homes

There is very little testimony concerning Barbara's home, but we can discern from the record that Barbara and the girls live in an apartment on the west side. David and Carla live in a three bedroom home with a loft, encompassing 1,500 square feet. There are seven full-time residents, including Alicia and Olivia, Carla's two sons, and David and Carla's infant daughter, Caitlyn. Alicia and Olivia share one bedroom, Carla's sons share a room, and although Caitlyn was sleeping in David and Carla's room, a nursery had been prepared in the loft for when she grew a little older. Although David traveled at times, he tried to arrange it so that he was out of town during Barbara's weeks with the children.

David testified that he believed the El Paso environment was more stable than the San Antonio environment. He was questioned concerning a letter his attorney/brother had written and indicated he agreed with the statements:

> The truth is that David and his wife have provided the children with a very stable family atmosphere. Certainly

this stable family environment existing while the children are with David, his wife, and other children is more conducive to true family life than a single parent dating boyfriends and working full time.

He explained that the girls were doing very well in school, were accustomed to their stepmother, were attached to their baby sister, have close friends nearby as well as their step-grandparents. They have no grandparents in San Antonio and "[t]hey do not have a school that they have done well in, in San Antonio." Judging from what he knew, the children's elementary school is one of the best in the state, not just in El Paso, and it was hard for him to imagine that anybody could surpass it. There was structure in El Paso, and to a lesser extent in San Antonio, although he "never ever said San Antonio was a miserable town to live in." However, his view on where the girls should live was unmistakably clear:

> Q: And so El Paso or New Orleans and nothing in between?
>
> A: That's the way I feel about it.

David characterized Barbara as a "good to excellent mother." He believed that relocating the girls to San Antonio would be an adjustment for them and would be a "negative situation." It would have an adverse affect on the children if they couldn't be with him to talk with him or do things with him on a regular basis.

#### The School

Alicia and Olivia are third-graders attending Polk Elementary School on El Paso's west side. Both girls are "A" students and Olivia is in the gifted and talented program. Under the state rating system, Polk has been rated as an exemplary

pointment of a sole managing conservator would be a positive improvement for and in

the best interest of the child. TEX.FAM.CODE ANN. § 156.203.

school, meaning the students do well on the TAAS exam. No other school in El Paso has consistently received such a rating. Principal Kathy Reaves testified the twins have never had disciplinary problems or appeared unhappy or maladjusted at school. They perform well academically and attend school regularly. Olivia's teacher indicated·that both Barbara and David are equally involved in discussions about her schooling. Her school journal indicates that her home life is happy in both David's and Barbara's homes. Alicia's teacher described her as a happy girl and her learning experience at Polk as positive. Alicia had never expressed anything negative about her home life and her teacher had not noticed any difference in her demeanor during the times she is with David compared to the time she spends with Barbara. Alicia seems very happy at both households and loves both parents. Barbara and David have taken an active interest in her schooling and it is apparent that both are well meaning and want the best for their children. The children attend Peace Lutheran Church day care after school. Although neither parent lived within the Polk District, David sought a waiver based on security issues related to his FBI employment and the proximity of the day care they were attending. David had not been involved in registering the children in their extracurricular activities since the divorce. He believed they "were in way too many activities;" he "didn't approve of the Brownie meetings and [Barbara] went ahead and did it anyway." Although he indicated the girls did not have Brownie meetings on the weeks they spent with him, the girls indicated that they only went to the meetings when they were with their mother "because um-um, our mom told our teacher that they're divorced and our dad can't really make it there."

### San Antonio Environment

#### The Home

The Pulcinis have not made a decision about where to live, but have placed a deposit on a four bedroom home in the Olympia Hills area. Joe described the neighborhood:

Q: Can you describe—well, first, I would like to know why you looked at that area specifically.

A: Well, as I said, I lived there for six years and I was very comfortable with my knowledge of the various neighborhoods, although some of the newer neighborhoods have changed some of the dynamographics [sic]. I looked in to, first all, if it was physically feasible based on where I work and where she works and fortunately all the best school district[s] coincide with the workplaces so that's fortunate.[16] Obviously, I looked at the quality of the school in proximity to our church, the proximity of a number of private schools that we looked into and a lot of subtle things about the neighborhood that really appeal to me.

Q: Like?

A: It's a newer neighborhood and it's— I like to use the word, enclave. It's a place where the prices range from 125 to half a million in terms of homes. So, it's a solidly middle class, upper middle class neighborhood. It's not snooty other than the few homes on the golf course.

16. Barbara explained that the home is ten minutes from Joe's office and ten to fifteen minutes from her office.

But, it's bounded on one side by a golf course, on another a polo grounds and a race track and it back ups [sic] to Randolph Air Force Base which is a large pilot training base. And on one side of the neighborhood is a street called Apacol Road, which is the closest analogy I can make is Mesa Street. It's sort of the main strip where you know there's shopping, supermarkets, et cetera, et cetera. So, it's kind of isolated by the golf course and the military base and it doesn't back up to any less desirable areas. I felt like it was a very safe area with a tremendous community spirit in the neighborhood. They have a very active homeowners' association that [sic]. The elementary school is separated and it's across the street from the community center with a pool and picnic areas and that sort of thing.

Q: How far are you from the community center?

A: Two blocks.

Q: And how far are you from the school?

A: The same.

### The School

Joe took primary responsibility for investigating the elementary school situation in San Antonio. He contacted the State Board of Education and the State Education Commission to look at the standardized test scores, the assessment criteria, dropout rates, truancy rates, and talked with many parents. However, Barbara communicated with him on school issues and has flown to San Antonio twice a month to look at schools, churches, and neighborhoods. She has communicated by e-mail with the principal at Olympia Hills Elementary who has referred her to the school's website which provides information about teachers, students, and activities. In her view, Olympia Hills is a good school with an excellent reputation and its TAAS scores compare favorably with Polk's. Barbara had investigated extracurricular activities and was particularly concerned whether a Brownie troop would be available. Olympia Hills offers both a Brownie and Girl Scout troop. Joe also mentioned the possibility of the girls attending a private Catholic parochial school affiliated with the church he attends. Both Olympia Hills Elementary and Our Lady of Perpetual Help have after school care programs.

### The Nature of the Parental Relationships

Although he has never been married before and has no children, Joe adores the girls and has a positive relationship with them. He informed the court about his income and benefits, as well as his love for and willingness to support Alicia and Olivia. He earns $122,000 per year and expected raises in January and June 2000 which would increase his salary to $127,000. The twins will be eligible for dependent benefits through the military. While Joe believed that relocation would be an adjustment for girls, there was no question in his mind that living together in San Antonio would best serve their needs, and be in their best interest. He also described the relationship between Barbara and the girls:

Q: Why would your household be a better household than the children are currently now [sic]?

A: Well, specifically I when I referred to it as my household with respect to the children, I refer to it as their mother's household. I believe—I mean, it's not a positive in a child's life to be removed from day to day contact with the other parent. I

firmly believe that the character of the bond between the girls and their mother is of a different character and a stronger character than the character of the bond between the girls and their father. I am not minimizing—David obviously loves his children and I'm not minimizing their love for him. But, I personally believe that the character of the bond between the girls and their mother is stronger. I think it was be [sic] a negative impact on the girls to loose [sic] day to day contact with their father and I think it would devastating [sic] is [sic] they lost daily contact with their mother.

Barbara described her relationship with her daughters in a similar vein:

Q: Do you believe your relationship with the girls is the same or different than their relationship with David? And if so, how?

A: I believe the children love us both, but, no, I would not say that David's relationship is the same as my relationship with the children.

Q: Could you tell me why?

A: I think I'm—I have been, since they were born, a more significant and consistent presence in their life as far as my diligence in participating and even for them, doctors' appointments, extracurricular activities, their religious education, their school. I've always been responsible for that and David always led me to believe that it was his preference that I would do that.

Barbara informed the court that she and David had previously talked about living over 100 miles apart and they had discussed extending summer vacation and holiday visits in that regard, as evidenced by the provisions of the divorce decree. San Antonio is equal distance between New Orleans and El Paso—550 miles to each city. There are frequent non-stop flights from San Antonio to El Paso via Southwest Airlines; the fares were reasonable, and Barbara was willing to pay 100 percent of the travel expenses. She planned initially to accompany the children on the flights until they adjusted to flying alone. She candidly admitted it will be an adjustment for Alicia and Olivia to move away from David, but did not state, as David asserts, that it would not be in their best interest to move to San Antonio without him. She described the relocation as inevitable and something that she and David had discussed from the date of divorce forward. She did not believe it would be in the children's best interest for her to remain in El Paso and become unemployed.

### *The New Orleans Factor*

The New Orleans factor permeates this record. David testified:

Q: Mr. Franco, isn't it a little idealistic to think that two people are divorced and you're wanting to move about the country as a family unit?

A: Barbara had always expressed to me that she wanted to move to New Orleans and I knew that's where I wanted to go; and with the FBI, that was the more likelihood based on the places that FBI agents want to go and New Orleans is not one of them for the most part. So, I realized I had a better chance of getting to New Orleans than I did in most places, and I was fortunate that that just happened to be the place I was from, and if Barbara's family is back there, and she was back there, and she had told me she didn't want to move to El Paso and she didn't want to be here and that she would

eventually move back to New Orleans.

. . .

Q: Okay. So, at this particular stage of both of your lives, being Barbara and yourself, the game plan has been disrupted because you can't back [sic] to New Orleans and Barbara doesn't want to go back to New Orleans; right?

A: Incorrect.

Q: Okay. Can you correct me then.

A: I can get back to New Orleans.

Q: How can you get back to New Orleans?

A: Put my name on the list.

Q: Okay. And now [sic] long would that take?

A: Six months to a year and that's my guess. It depends on the money, and travel and everything. But in the past two or three years, I would say it's an average of six months to a year.

Q: Okay. Now, that was not the situation when you mentioned earlier you put a transfer in?

A: Right. My seniority is much greater now than it was in the past.

Q: So, you can leave—I'm not saying at any time. But, you can leave within the next year to New Orleans?

A: Absolutely.

Q: Okay. Let me as [sic] you this. Supposing this Court granted Mrs. Franco primary conservatorship and she moves to San Antonio. How fast would you put your transfer order in?

A: Really I have no idea, sir.

Q: Do you still have a desire to go back to New Orleans?

A: It's where my family is. Yes, sir.

David's family has been in New Orleans for generations and "knows everything about the schools, knows the neighborhoods and knows what's best for the kids." Barbara commented that the public schools in New Orleans do not have a good reputation and that even the parochial schools did not measure up to Polk's standards.

### Analysis

Bearing in mind that David has raised only a legal sufficiency complaint, we have presented the foregoing testimony in a light most favorable to the trial court's judgment. Certainly David provided evidence of a positive relationship with his children and testimony that he is a constant presence in their lives. His characterization of the evidence, simply stated, is that because relocation will require an adjustment on the part of the children, it cannot possibly be a positive improvement. Were that the case, relocation would never be permissible, because any move necessarily causes some disruption in a child's routine and environment. We are keenly aware that relocation in this particular instance will cause the girls to see their father far less frequently. David construes that as a negative situation which cannot possibly be considered a positive improvement. And if that were the case, relocation would never be permissible, because sheer geography dictates that virtually any move from El Paso County would in practical terms cause the girls to see David less frequently.

■ We frame the question differently. In determining positive improvement, do we compare the status quo—week on/week off in El Paso—with long distance visitation between San Antonio and El Paso? Or do we accept the premise that there has been a material and substantial change in circumstances, which David does not con-

test, and determine positive improvement based on the options available? In some cases, the options are status quo versus a parent's relocation. In that instance, certainly a court would inquire into the motivation for the move, the impact on the children in terms of time spent with the non-relocating parent,[17] the age of the child, the nature of the relationship between the child and the non-relocating parent, and the desires of the child, to name just a few. These factors have indeed been considered by the courts.

We begin our analysis with *Lenz v. Lenz*, 40 S.W.3d 111 (Tex.App.-San Antonio 2000, pet. granted). Romy and Rudi Lenz are German citizens and were married in Germany in 1980. They moved to Arizona in 1991 with their four-year-old son. A second son was born the following year. The couple ultimately entered into a legal separation under Arizona law which included a joint custody agreement naming Romy as the primary residential parent. The agreement recited the parents' intent to relocate to San Antonio and to restrict residency of the children to Texas. Both parents moved to San Antonio in 1997. They divorced the next year and the decree incorporated by reference the Arizona joint custody agreement. While Romy had the exclusive right to determine the children's residency, she was required to live with the children in Texas.

One month after the divorce, Romy filed a motion to modify in which she sought to remove the residency restriction based upon her desire to return to Germany and her plans to remarry. A jury determined that Romy should have the exclusive right to determine the children's residency. Rudi filed a motion for judgment *non obstante veredicto*, alleging that Romy had

failed to meet the statutory requirements for modification. He also asked the trial court to issue orders specifying a fixed geographical location for the residence of the children. The trial court entered an order which did not delete the Texas residency restriction and it went further in restricting Romy's right to establish the primary residence of the children in Bexar County. Inasmuch as Rudi had limited his challenge of the jury's verdict to the best interest prong, the appellate court construed the trial court's actions as having found no evidence to support the jury's finding that removal of the Texas residency restriction was in the best interest of the children. *Id.* at 114. In concluding that Romy had failed to meet her burden, the court stated:

> Although the evidence may suggest that the boys' living situation in Germany would be similar to or equal with their current situation, this does not satisfy Romy's statutory burden of establishing that relocation would be in the boys' best interest and a positive improvement. At best the evidence suggests that modification to allow a move to Germany could be a positive improvement for Romy, but not for the boys. While the trial court stated that its order did not restrict Romy's freedom to 'change her address and domicile,' the obvious practical impact of the order is that Romy must remain in Texas where she is unhappy if she wants to maintain custody of her boys. Romy is offered the chance of a fresh start in Germany where she is more comfortable; but under Texas law with the 'best interest of the child' as the standard, Romy cannot undertake that fresh start with her children. She must choose between her

---

**17.** Relocation away from a parent who visited infrequently or visited pursuant to the standard possession order would have far less impact upon a child than relocation away from a parent who had possession every other week for several years, as David has here.

interests and the best interest of her boys. Unfortunately, in this case the interest of the parties are at odds. The Family Code specifies that the best interest of the children must prevail. . . .

*Id.* at 116–17.

David argues that *Lenz* is directly on point and clearly controlling authority. We are of the view that *Lenz* addresses the first of our hypotheticals. Romy wanted to move the boys from San Antonio to Germany, while Rudi would remain in San Antonio, a place the boys considered home and where they have established relationships with their friends. *Lenz*, 40 S.W.3d at 117. Here, however, abundant testimony exists from which the trial court could reasonably infer that David has no plans to remain in El Paso, that it has always been his intention to relocate to New Orleans, that he and Carla were planning to move shortly after their marriage, that the plans were so well known to the children that Craig Hoffer initiated a lawsuit, that Carla represented to the court that she would be moving to New Orleans within six months, and that Barbara's name never came up in the discussion. While David changed his testimony from time to time concerning his immediate plans, a reasonable fact finder could well conclude that the parties had contemplated the relocation of one or both parents from the time of divorce, that David has moved past contemplation toward implementation, and that the status quo of week on/week off with each parent was not an available option. Absent what we have termed the New Orleans factor, we would be more receptive to David's complaints. We must also consider that Barbara believed her job to be in jeopardy,[18] that the company had laid off 28 percent of its work force in a nine-month period, that Barbara approached David for financial assistance in the event she lost her job, that he refused to help her and instead advised her she could move to New Orleans to live with her parents, and that he never offered any financial assistance despite a salary which was twice that of Barbara's. Moreover, he never disapproved of uprooting the children from El Paso, their exemplary school, their friends, and their activities; he just wanted to dictate the location of the move:[19]

> Q: And so El Paso or New Orleans and nothing in between?
>
> A: That's the way I feel about it.

We recognize that evidentiary review in relocation cases is inherently fact specific, and that is certainly true here. However, based upon our review of the record, we conclude that the trial court had sufficient information upon which to exercise her discretion, and while perhaps we would not have lifted the domicile restriction, the mere fact that Judge Rangel decided this matter in a different manner than we would does not demonstrate that an abuse of discretion occurred. We thus conclude that based on the elicited evidence, Judge Rangel made a reasonable decision. Point of Error No. Two is overruled.

## EXCLUSION OF EVIDENCE

In Point of Error No. Three, David contends that the trial court erred in excluding documents from the Catholic Diocese of El Paso concerning Barbara's petition for annulment. We review a trial court's decision on the admissibility of evidence for an abuse of discretion. *Apresa*

---

18. We reiterate yet again that in conducting a legal sufficiency review, we do not consider conflicting testimony but instead consider the evidence in the light most favorable to the judgment.

19. Barbara's attorney characterized it as an issue of control—"his way or the highway."

*v. Montfort Ins. Co.,* 932 S.W.2d 246, 249 (Tex.App.-El Paso 1996, no writ); *Fandey v. Lee,* 880 S.W.2d 164, 168 (Tex.App.-El Paso 1994, writ denied).

David issued a subpoena for the documents in order to determine whether, in fact, the annulment proceeding was final and in order to impeach Barbara's credibility. When the Diocese declined to produce them, he moved to compel production. In response, the Diocese sought a protective order. Judge Rangel conducted a hearing on David's motion to compel five days before trial at which the Diocese claimed that (1) the documents were protected under the First Amendment because the records were purely ecclesiastical, related to a church proceeding, were governed entirely by canon law, and had nothing to do with civil law; (2) the records were protected under the clergy communication privilege countenanced in TEX.R.EVID. 505; and (3) the documents were tendered to David only after he signed a confidentiality agreement in which he agreed that he would review them for purposes of the ecclesiastical proceeding and not for any other purpose. The Diocese then offered to produce testimony which would elicit certain evidence David sought to compel:

> Counsel for the Diocese: It's my understanding that the primary concern is to make a determination whether the annulment is actually final and whether or not the parties received notification of the finality of it. We can—and I have provided Father Rick Zamorano, who is the Judicial Vicar and who is in charge of the Tribunal and who has had an opportunity to look at the file. He can explain to the Court what the process is, where it currently stands, and whether or not the annulment is final and wheth-

er or not the parties have actually received notification as to that.

> The Court: Mr. Leachman, will you agree with [counsel] that would be the reason for the subpoenaing of the annulment records?
>
> Mr. Leachman: Judge, that is the partial reason of the subpoenaing—that I subpoenaed the records, and I would be interested in pursuing that middle ground, if that's the only way we can address the issue.

Leachman explained that the impeachment material would become relevant because of testimony Barbara gave in her deposition concerning her plans for a church wedding to Joe:

> In her deposition she said she was not going to get married until her annulment was final and that the reason she got married October the 23rd was because her annulment was final at that time. We believe that the documents will show—and indeed if we can't have the documents, I'm going to ask the Judicial Vicar [to] testify that it still isn't final. It becomes very relevant in the case before the Court because we think that that's one more instant [sic] of her taking the action and trying to affect these proceedings.

Leachman also alleged that during the annulment proceeding, Barbara had represented to the church certain information David believed to be "absolutely false,"[20] that the tribunal reached conclusions with respect to the veracity of Barbara's testimony, and that this information would be relevant to character and credibility.

The judicial vicar for the Diocese offered brief testimony concerning the tribunal proceedings of the church and the annul-

---

**20.** David alleged that Barbara made misrepresentations about the fault in the breakup of their marriage. While the record before us does not include the Diocesan documents, it does reveal that Barbara engaged in an extramarital affair during the marriage.

ment process. When a petition for annulment is filed, the respondent is given an opportunity to review the petition, and it is customary for the Diocese to require that a respondent sign a confidentiality agreement. The Court of First Instance determines whether the marriage was a sacramental marriage under canon law. Once a decision is reached, it proceeds to the Court of Second Instance, which the vicar described as an appellate court. This Province or Provincial Court is located in San Antonio. Under canon law, the Court of Second Instance must review the matter before the annulment becomes final. Thereafter, the parties have the option of pursuing an appeal to the Roman Congregation, the Roman Roda, and then to the Apostolic Signatora, the Supreme Court. The latter two procedures are not automatic and must be initiated by a party to the proceeding.

At the time of the hearing on the motion to compel, the Court of First Instance in El Paso had rendered its decision on Barbara's petition and forwarded the matter to the Court of Second Instance in San Antonio; the San Antonio court had not yet ruled on the petition. Consequently, the annulment was not final and the parties would have been provided an explanation of the appellate process. Canon law provides that a person may not contract another marriage in the church until notified by the Court of Second Instance. Whether a person decides to remarry in a civil ceremony is of no consequence to the annulment proceedings. At the conclusion of the hearing, Judge Rangel denied the motion to compel without stating the basis for her ruling.

■ Evidence is presumptively discoverable and the burden is on the party resisting discovery to plead the privilege claimed and to present evidence supporting the claim. *Loftin v. Martin,* 776 S.W.2d 145, 147 (Tex.1989); *Turner v. Montgomery,* 836 S.W.2d 848, 850 (Tex. App.-Houston [1st Dist.] 1992, no writ). Rule 193.4 allocates the burdens for pleading and proving a claim of privilege. Any party may at any reasonable time request a hearing on an objection or claim of privilege. Tex.R.Civ.P. 193.4(a). The party asserting the privilege must produce any evidence necessary to support its claim of privilege. *Id.* If the court determines that an *in camera* review is necessary, the material must be segregated and produced to the court in a sealed wrapper within a reasonable time following the hearing. *Id.* Here, despite having requested in the motion to compel that Judge Rangel conduct an *in camera* inspection of the documents, David made no such request during the hearing. The records were never tendered to the court for her review nor preserved for ours.

David was able to cross-examine the judicial vicar regarding the finality of the annulment proceedings, and by this information, he was able to thoroughly, and effectively, cross-examine Barbara and Joe concerning their civil marriage and the timing of it. He does not complain on appeal that he was unable to develop this line of impeachment. Instead, he focuses on the issue that the statements Barbara made to the Diocese in seeking an annulment were false, were found by the church tribunal to be false, and demonstrated her willingness to manipulate quasi-judicial proceedings to obtain a favorable result.

Rule 103(a) provides that error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and, if the trial court excludes evidence, the substance of the evidence was made known to the court by offer, or was apparent from the context within which the questions were asked. Tex.R.Evid. 103(a)(2). Be-

cause the Diocesan documents were not preserved for our review, we have only the testimony of the judicial vicar:

Q: And is it uncommon for the decision to speak to—to make findings with respect to the truthfulness of the witnesses and that sort of thing?

A: Does it state as far as the truthfulness of the witnesses? Is that what you're asking?

Q: It is.

A: The canonical word that we use is 'Moral Servitude'—that is part of our Church lingo if you want to call it that—that says from the evidence presented to us in both Petitions and all of the witness statements, that the Judge makes by moral servitude, that he is declaring this marriage to be valid or invalid depending.

Q: Okay. What I'm understanding, that that's sort of like the standard on which the Judge makes their decision; is that correct? They have to find a finding that it should be annulled to a degree of moral servitude?

A: That's correct.

The Court: This would be the burden of proof, what you're asking. The witness has to swear to the evidence.

Q: Did they swear to the evidence, and is it common for the Tribunal to make findings as to the veracity of the witnesses in connection with the proceeding?

A: Well, I'm not real sure if I understand your question, but the Judge looks at all the information, you know, the Petitioner, the Respondent, the witness statements, and from that makes a decision—first of all, I mean very early on in the process you have to find grounds to see if there are grounds for—for the Petition. The Petitioner or the Respondent, neither of them make the grounds. The grounds come up in the information that we have. We have a long list of possible grounds, and once the grounds are established, all that—everything is brought in and reviewed, then the Judge makes a decision whether the marriage was invalid according to certain grounds.

Q: Okay. And I don't want to belabor the point, but it would not be uncommon for the decision to have some language in there like 'One witness was not forthcoming' or something like that or that—

A: Possibly, yes.

Thus, the record does not establish that a misrepresentation was made, that any of Barbara's statements were "absolutely false," or that the tribunal so found. We might speculate that David wanted to demonstrate that Barbara either lied about her extramarital affair or in some other manner, diverted fault in the breakup of the marriage to David rather than taking responsibility for her own actions. However, even if we were to agree that the trial court erroneously excluded the evidence, we must still conduct a harm analysis. *Texas Department of Transportation v. Able*, 35 S.W.3d 608, 617 (Tex.2000); TEX. R.APP.P. 61.1.

 Formulations of the harmless error rule vary from time to time; since 1989, however, the Supreme Court has consistently followed the formulation contained in former TEX.R.APP.P. 81(b)(1). *E.g., Hill v. Winn Dixie Texas, Inc.*, 849 S.W.2d 802, 803–04 (Tex.1992); *Elbaor v. Smith*, 845 S.W.2d 240, 251 (Tex.1992); *Alvarado v. Farah Manufacturing Company, Inc.*, 830 S.W.2d 911, 917 n. 8 (Tex. 1992); *McCraw v. Maris*, 828 S.W.2d 756, 757–58 (Tex.1992); *Gee v. Liberty Mutual Fire Insurance Company*, 765 S.W.2d 394,

396 (Tex.1989). Harmful error is shown under this test when the evidence is controlling on a material issue and is not cumulative. *Mentis v. Barnard,* 870 S.W.2d 14, 16 (Tex.1994). A successful challenge to evidentiary rulings usually requires a showing that the judgment turns on the particular evidence in dispute. *Able,* 35 S.W.3d at 617, *citing City of Brownsville v. Alvarado,* 897 S.W.2d 750 (Tex.1995). In the absence of a record demonstrating the precise nature of the disputed evidence, we cannot ascertain whether it was merely cumulative or whether it would have been so controlling on a material issue dispositive to the case such that the judgment would have turned upon it. Because David has not brought forward a record by which we can perform a harm analysis, Point of Error No. Three is overruled.

## CUMULATIVE ERROR

Finally, David contends that the cumulative nature of the errors committed below require reversal, even if each standing alone would not. Because we have found no error on the record before us, we overrule Point of Error No. Four and affirm the judgment of the trial court.