Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

ELVIA CORRAL,
)
 No. 08-01-00506-CV

)


 Appellant,
)
 Appeal from

)
 

v.
)
 County Court at Law No. 4

)


LEVI STRAUSS & COMPANY,
)
 of El Paso County, Texas

)


 Appellee.
)
 (TC# 99-1678)


MEMORANDUM OPINION



 Elvia Corral appeals from a take nothing judgment entered in favor of her former employer
Levi Strauss & Company. We affirm.

FACTUAL SUMMARY


 Levi Strauss has a policy which provides employees with twelve months of medical leave
for those who are medically unable to work. If an employee remains unable to work after the twelve-month period, he or she is terminated from employment. On September 17, 1997, Levi Strauss
discharged Corral from employment as a sewing machine operator because she had been absent for
approximately twenty-six months due to an on-the-job injury and she could not return to work even
with reasonable accommodation. 

 Corral had been employed as a sewing machine operator for Levi Strauss since 1985. She
performed the hang pocket sewing operation which required repetitive movements. In 1988, Corral
developed carpal tunnel syndrome in her right hand and she had surgery as a result. She injured her
left hand in 1994 but she did not have surgery for that injury. In June of 1996, Corral developed
swelling in her right wrist. Corral also had other physical ailments, including high blood pressure,
cervical sprain, thoracic sprain, lumbosacral sprain, internal derangement of the right knee, and
rotator cuff bursitis of her right shoulder. Three different physicians treated Corral for her work-related injuries: Dr. Jeffrey Keim, Dr. Joseph Neustein, and Dr. Arthur Bieganowski. Dr. Keim and
Dr. Bieganowski treated the hand injuries while Dr. Neustein addressed the injuries to her knee,
back, and shoulders.

 Dr. Bieganowski released Corral to return to work in April of 1997, but with physical
restrictions. Dr. Keim also released her to work with physical restrictions. The Return to Work
Committee (1) returned Corral to work in the "hang pocket" operation and accommodated her physical
restrictions by placing her on a reduced production quota. She was expected to be back at 100
percent production after five weeks. Corral, however, had substantial difficulty meeting the reduced
production quota to the point that she produced no more than 80 percent of her quota after three
months back at work. Corral complained to her supervisor that the terminal which recorded her
production was inaccurately measuring her work. Inspection of the terminal revealed no defects and
Corral's supervisor verified the results by manually counting her production. Corral continued to
fall short of her quota even after a new terminal was installed. Other operators who used the new
terminal did not report any problems.

 On July 14, 1997, Corral became so upset about her reduced production and perceived
problems with the terminal that her blood pressure became dangerously elevated at 200/90. This
type of hypertensive crisis put Corral at risk of having a stroke so the company nurse recommended
that Corral see her doctor immediately. Corral's family picked her up from work and took her to
Dr. Natalie Bornstein who had been treating Corral's pre-existing problems with high blood
pressure. Because Corral's frustration with her inability to meet her production quota had
precipitated the dangerous increase in blood pressure, Levi Strauss would not let Corral return to
work until Dr. Bornstein released her. Additionally, Levi Strauss questioned whether Corral could
physically perform the job given her inability to return to 100 percent production. 

 Over the next several months, Corral's doctors provided conflicting reports pertaining to her
ability to return to work and the restrictions to be placed on her. On August 5, 1997, Dr. Keim
released Corral to return to work but imposed a new physical restriction by precluding Corral from
pushing more than twenty pounds at work. Teresa Gallardo, the company nurse and also a member
of the Return to Work Committee, believed Corral was not medically able to return to work if she
could not push a cart weighing more than twenty pounds because the job required it. On August 28,
1997, Dr. Keim further restricted Corral by requiring her to push or pull no more than ten pounds. 
Dr. Keim kept these restrictions in place with his note of September 23, 1997. Two days later,
Dr. Neustein released Corral to return to work in the hang pocket operation on a limited basis, but
unlike Dr. Keim, he did not specify any restrictions. Faced with these conflicting statements, Levi
Strauss did not return Corral to work. 

 In reports dated October 14, 1997 and December 17, 1997, Dr. Keim stated that Corral could
not return to work. In his reports dated January 14, 1998 and February 11, 1998, Dr. Keim noted that
Corral needed retraining or retirement. He did not indicate she could return to work until May 5,
1998. At that point, he recommended a "re-entry program" but did not specify any restrictions. 
Three days later, on May 8, 1998, Dr. Neustein opined that Corral could return to work "as per
F.C.E.." (2) On June 5, 1998, Dr. Keim indicated that he would permit Corral to return to work in a
re-entry program provided she not lift more than ten pounds. Levi Strauss did not return Corral to
work because it could not accommodate this restriction. Given the conflicting reports, Levi Strauss
asked both Dr. Keim and Dr. Neustein for clarification. Although Corral had been on medical leave
for more than twelve months, the company extended her medical leave while it sought this
information.

 Nati Reyes, the Prevention, Safety and Health Process Leader at Levi Strauss, wrote to Dr.
Neustein and asked whether his May 8, 1998 note referred to the F.C.E. dated February 11, 1997,
and if so, whether he believed the F.C.E. to still be valid given the length of time which had passed. 
Reyes also wrote to Dr. Keim asking what medical improvements Corral had made since Dr. Keim
had previously concluded that Corral needed retraining or retirement. Neither doctor immediately
replied so Reyes wrote them again the following month. Dr. Keim responded by preparing a
Physician Restriction Form on July 14 in which he indicated that Corral should never perform
overhead or floor level lifting and should only occasionally push ten pounds or pull five pounds. 
Dr. Keim also concluded that Corral should not squat, kneel, or climb, and she should not perform
movements which required overhead, backward, or sideways reaching. Dr. Neustein did not respond
to the request for additional information until August 19, 1998 when his office faxed to Levi Strauss
a letter dated July 8, 1998. He believed that the F.C.E. dated February 11, 1997 was still valid, and
he was of the opinion that Corral could return to full-time work provided she could abide by the
F.C.E.'s stated restrictions. Unlike Dr. Keim, he found that Corral had no difficulty squatting,
kneeling, or climbing, and she could perform overhead, backward, and sideways reaching
movements. Reyes wrote to Dr. Neustein once again and asked whether he would clarify his opinion
in light of the restrictions placed on Corral by Dr. Keim. On September 8, 1998, Dr. Neustein sent
a letter to Levi Strauss indicating that Corral could return to full-time work and she could attempt
overtime work on a trial basis. He required her to use splints on a permanent basis and she should
engage in overhead use of her arms only on an occasional basis. 

 In order to resolve the conflicting medical opinions expressed by Corral's doctors, Levi
Strauss asked Corral whether she would submit to an independent medical examination. Corral
initially refused but eventually agreed to be examined by Dr. Brian August. Both Levi Strauss and
Corral agreed to be bound by the doctor's findings and Levi Strauss agreed to make every effort to
accommodate the restrictions specified by the independent doctor.

 Dr. August examined Corral on May 12, 1999 and referred her for a functional capacity
evaluation which was completed on July 13, 1999. The functional capacity evaluation was delayed
because Corral's blood pressure had been elevated at the time of the original evaluation. Dr. August
completed the Physician Restriction Form on August 26, 1999. He concluded that Corral could
function in a sedentary level of work activities. He found that she should be able to lift, push, or pull
ten pounds on a frequent basis, and could perform squatting and bending activities. He would also
restrict her from performing any overhead activities on the right side. Dr. August also concluded that
Corral should only occasionally perform fine manipulation, repetitive pinching, and repetitive
gripping. 

 On September 9, 1999, members of the Return to Work Committee, including a union
representative, met and discussed whether any of the company's sewing operations could be
modified to meet Corral's restrictions. The Committee particularly considered whether Corral could
perform the "Serge Back Panels" operation and concluded that she could not perform the job with
the restrictions imposed on her by Dr. August. Pursuant to its medical leave policy, Levi Strauss
terminated Corral on September 17, 1999 because she had been on medical leave for more than one
year.

 Corral filed a retaliatory discharge claim against Levi Strauss pursuant to Section 451.001
of the Texas Labor Code. (3) A jury determined that Corral had not proven that Levi Strauss terminated
her because she had filed workers' compensation claims. Consequently, the trial court entered a take
nothing judgment in favor of Levi Strauss. 

RETALIATORY DISCHARGE


AS A MATTER OF LAW



 In Issue One, Corral challenges the legal sufficiency of the evidence supporting the jury's
negative answer to Question No. 1, which asked:

 Did LEVI STRAUSS & CO. discharge and/or discriminate against ELVIA CORRAL
because she filed a workers' compensation claim in good faith, or hired a lawyer to
represent her in a workers' compensation claim, or instituted or caused to be
instituted a workers' compensation claim in good faith?


 There may be more than one cause for an employment decision. An employer does
not discharge an employee for filing a workers' compensation claim in good faith,
hiring a lawyer to represent her in a workers' compensation claim, or instituting or
causing to be instituted a workers' compensation claim in good faith, if the employer
would have discharged the employee when it did even if the employee had not filed
a workers' compensation claim in good faith, hired a lawyer to represent her in a
workers' compensation claim, or instituted or caused to be instituted a workers'
compensation claim in good faith.

Relevant Substantive Law


 Corral asserts that she established as a matter of law that Levis Strauss discharged her or
otherwise discriminated against her in violation of Chapter 451 of the Texas Labor Code. Section
451.001 provides that:

 A person may not discharge or in any manner discriminate against an employee
because the employee has:


 (1) filed a worker's compensation claim in good faith;


 (2) hired a lawyer to represent the employee in a claim;


 (3) instituted or caused to be instituted in good faith a proceeding under Subtitle A; 
or


 (4) testified or is about to testify in a proceeding under Subtitle A.


Tex.Lab.Code Ann. § 451.001.

 Section 451.001 is a statutory exception to the Texas common-law doctrine of
employment-at-will. Lozoya v. Air Systems Components, Inc., 81 S.W.3d 344, 347 (Tex.App.--El Paso 2002, no pet.); Jenkins v. Guardian Industries Corp., 16 S.W.3d 431, 435 (Tex.App.--Waco
2000, pet. denied). The purpose of this statute is to protect persons entitled to benefits under the
Workers' Compensation Act and to prevent them from being discharged for filing claims to collect
those benefits. Trico Technologies Corp. v. Montiel, 949 S.W.2d 308, 312 (Tex. 1997); Lozoya, 81
S.W.3d at 347. Thus, the section has both remedial and deterrence objectives. Lozoya, 81 S.W.3d
at 347. An employee can recover damages for retaliatory discharge under this provision only if she
proves that without her filing a workers' compensation claim, the discharge would not have occurred
when it did. Continental Coffee Products Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Lozoya,
81 S.W.3d at 347. This causal link may be established by direct or circumstantial evidence. Lozoya,
81 S.W.3d at 347. Circumstantial evidence sufficient to establish a causal link between termination
and filing a compensation claim includes: (1) knowledge of the compensation claim by those
making the decision to terminate; (2) a negative attitude toward the employee's injured condition;
(3) failure to adhere to established company policies; (4) discriminatory treatment of the injured
employee in comparison to similarly situated employees; and (5) providing incentives to refrain from
reporting on-the-job injuries. Id. at 347-48; Wyler Industrial Works, Inc. v. Garcia, 999 S.W.2d 494,
501 (Tex.App.--El Paso 1999, no pet.). Further, proof that the stated reasons for the discharge are
false is sufficient to establish that the employee was terminated in violation of Section 451.001. 
Lozoya, 81 S.W.3d at 348, citing Continental Coffee, 937 S.W.2d at 452. Once the link is
established, it is the employer's burden to rebut the alleged discrimination by showing there was a
legitimate reason behind the discharge. Lozoya, 81 S.W.3d at 348; Terry v. Southern Floral Co., 927
S.W.2d 254, 257 (Tex.App.--Houston [1st Dist.] 1996, no pet.).

 Uniform enforcement of a reasonable absence-control provision does not constitute
retaliatory discharge. Lozoya, 81 S.W.3d at 348, citing Continental Coffee, 937 S.W.2d at 451. If
an employee's termination is required by the uniform enforcement of a reasonable absentee policy,
then it cannot be said that termination would not have occurred when it did but for the employee's
assertion of a compensation claim or other conduct protected by Section 451.001. Id. Consequently,
an employer who terminates an employee for violating such a rule cannot be liable for retaliatory
discharge so long as the rule is uniformly enforced. Id.

Standard of Review


 When attacking the legal sufficiency of the evidence to support an adverse finding on an issue
for which she had the burden of proof, i.e., challenging the trial court's finding as a matter of law,
the appellant must demonstrate on appeal that the evidence conclusively established all the vital facts
in support of the issue. Sterner v. Marathon Oil Company, 767 S.W.2d 686, 690 (Tex. 1989); In re
Estate of Livingston, 999 S.W.2d 874, 879 (Tex.App.--El Paso 1999, no pet.). A party attempting
to overcome an adverse fact finding as a matter of law must surmount two hurdles. Sterner, 767
S.W.2d at 690; Livingston, 999 S.W.2d at 879. First, the record must be examined for evidence that
supports the finding, while ignoring all evidence to the contrary. Sterner, 767 S.W.2d at 690;
Livingston, 999 S.W.2d at 879. Second, if there is no evidence to support the finding, then, the
entire record must be examined to see if the contrary proposition is established as a matter of law. 
Sterner, 767 S.W.2d at 690; Livingston, 999 S.W.2d at 879. Only if the contrary position is
conclusively established will the point of error be sustained. Livingston, 999 S.W.2d at 879-80.

Review of the Evidence


 It is undisputed that Levi Strauss has a twelve-month medical leave policy which applies to
all employees, not just those who have been injured on the job. Following her 1996 injury and a
leave of absence, Corral returned to work in April of 1997. She was initially placed on a reduced
production curve which she could not maintain as the requirements became progressively more
demanding. Over the next several months, Dr. Keim imposed restrictions on Corral which could not
be accommodated by Levi Strauss. On October 14, 1997, Dr. Keim took Corral off of work for the
next six months. In July of 1998, Dr. Keim released Corral to return to work but once again he
placed restrictions on her which Levi Strauss could not accommodate. Dr. Neustein's evaluation of
Corral was inconsistent with that of Dr. Keim even after Levi Strauss sought clarification from both
doctors. Consequently, Levi Strauss proposed that Corral be examined by an independent third
physician. Dr. Brian August performed that independent evaluation of Corral and determined that
she could work albeit with certain restrictions. The Return to Work Committee determined that
Corral could not perform any sewing jobs even with reasonable accommodations. Consequently,
Levi Strauss discharged Corral pursuant to its medical leave policy because she had been absent
more than twenty-six months. This evidence supports the jury's determination that Levi Strauss did
not discharge Corral because she engaged in protected conduct. Issue One is overruled.

AGAINST THE GREAT WEIGHT AND PREPONDERANCE CHALLENGE


 In Issue Two, Corral contends that the jury's answer to Question No. 1 is against the great
weight and preponderance of the evidence. Levi Strauss argues that Corral failed to preserve this
issue for review. We agree. Pursuant to Rule 324(b) of the Texas Rules of Civil Procedure, a
motion for new trial is a prerequisite to an appellate complaint of factual insufficiency of the
evidence to support a jury finding or a complaint that a jury finding is against the overwhelming
weight of the evidence. Tex.R.Civ.P. 324(b)(2), (3); El Paso Healthcare System, Ltd. v. Piping
Rock Corp., 939 S.W.2d 695, 703 (Tex.App.--El Paso,1997, writ denied). Although Corral filed a
motion for new trial, she did not raise an issue asserting that the jury's answer to Question No. 1 is
against the great weight and preponderance of the evidence. Accordingly, her complaint is waived.

Issue Two is overruled.

ADMISSION OF EVIDENCE


 In Issues Three and Four, Corral complains about the admission of certain evidence at trial. 
The admission or exclusion of evidence is left to the sound discretion of the trial court. Franco v.
Franco, 81 S.W.3d 319, 340-41 (Tex.App.--El Paso 2002, no pet.); Lohmann v. Lohmann, 62
S.W.3d 875, 881 (Tex.App.--El Paso 2001, no pet.). We will not disturb the trial court's ruling
absent an abuse of discretion. See Franco, 81 S.W.3d at 340-41. A trial court abuses its discretion
only if it acted unreasonably or in an arbitrary manner, without reference to any guiding rules or
principles. Butnaru v. Ford Motor Company, 84 S.W.3d 198, 211 (Tex. 2002). Further, errors in
admitting evidence will not require reversal unless the error was reasonably calculated to cause and
probably did cause rendition of an improper judgment. Tex.R.App.P. 44.1(a)(1); Gee v. Liberty Mut.
Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989). This standard is met only where the erroneously
admitted evidence controlled the judgment. See Gee, 765 S.W.2d at 396.

Evidence of the Union Contract


and Findings by UNITE (4) and NLRB



 Corral first argues that the trial court erred in admitting irrelevant evidence of the union
contract and the findings by UNITE and the National Labor Relations Board that Levi Strauss did
not violate the union contract when it discharged Corral. The Texas Rules of Evidence defines
"relevant evidence" to mean evidence having any tendency to make the existence of any fact that is
of consequence to the determination of the action more probable or less probable than it would be
without the evidence. Tex.R.Evid. 401. According to Corral, evidence of the union contract, her
union grievances pertaining to her discharge, and the findings by UNITE and the NLRB are
irrelevant to her suit against Levi Strauss.

 Levi Strauss responds that Corral opened the door to admission of the challenged evidence
by eliciting evidence that Levi Strauss could have accommodated Corral by displacing another
employee to create a position for Corral. During the cross-examination of Levi Strauss's Human
Resource Manager, Estela Ortiz, Corral's attorney showed Ortiz the September 17, 1999 discharge
letter sent to Corral. The following exchange then occurred:

 [Corral's attorney]: This letter of September 17, 1999, Ms. Ortiz, you wrote to Elvia
saying that you had made ever [sic] effort, correct? (5)


 [Ortiz]: That's correct.


 [Corral's attorney]: Is that correct when you were considering whether you should
put her back to work or not? Did you consider moving somebody from a hang pocket
operation and putting them elsewhere?


 [Ortiz]: You mean pulling them so that I can accommodate them for somebody else?


 [Corral's attorney]: Sure.


 [Ortiz]: We don't allow pulling people to accommodate somebody else.


 [Corral's attorney]: It's your policy not to do that?


 [Ortiz]: That's correct.


 [Corral's attorney]: That's not something that the law prohibits you from doing. It's
your policy to do that.


 [Objection sustained.]


 [Corral's attorney]: Do you know if it's unlawful to move somebody from one
position to another within the plant?


 [Ortiz]: It's not unlawful, no.


. . .



 [Corral's attorney]: But with respect to Ms. Corral, you made it a point, and it was
Levi Strauss' decision not to move somebody from hang pocket position to
accommodate her, correct?


 [Ortiz]: We could not bump somebody that had been there to accommodate her. 
That was their job. I couldn't bump other operators.


. . .



 [Corral's attorney]: Did Levi Strauss and Company make the decision not to move
somebody as a hang pocket operator to a different position to accommodate Ms.
Corral?


 [Ortiz]: Yes. 


 In response, Levi Strauss offered evidence that it could not displace another employee
without violating the union contract. According to Ortiz, the union contract prohibits Levi Strauss
from displacing or "bumping" an employee from his or her operation. The contract provides that
an employee with physical limitations may be accommodated into a different operation by
reassignment to a "future job vacancy" without engaging in job bidding but it does not provide for
the creation of a vacancy by displacing another employee. Levi Strauss also introduced evidence that
Corral filed grievances with UNITE and the NLRB regarding her discharge. In the grievance filed
with UNITE, Corral argued that she was discharged in violation of the Americans with Disabilities
Act and because she had made a complaint to the Equal Employment Opportunity Commission. 
Corral's grievance filed with the NLRB alleged that Levi Strauss discharged her because she had
engaged in union activities. UNITE determined that Levi Strauss had not violated the union contract
but had instead complied with the medical leave policy contained in the contract. Following an
initial investigation of Corral's complaint, the NLRB refused to issue a complaint or engage in
further proceedings. 

 We agree with Levi Strauss that the union contract and Ortiz's testimony regarding the
company's inability to displace another employee without violating the union contract are relevant
to rebut Corral's assertion that Levi Strauss could have and should have displaced another employee
to accommodate her. Therefore, the trial court did not abuse its discretion in finding this evidence
to be relevant. However, Corral's filing of union grievances and the adverse findings by UNITE and
the NLRD are not relevant to this same issue. Levi Strauss alternatively argues that Corral's union
grievances and the union findings are relevant because they show that she had made inconsistent
claims. Because Corral's credibility and her motivations in bringing suit were obviously at issue,
we agree that the union grievances and the findings are relevant.

 Corral also argues that the trial court abused its discretion in admitting this evidence because
its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the
jury. See Tex.R.Evid. 403. She claims that the evidence is unfairly prejudicial because it showed
the jury that Levi Strauss had no liability for a violation of Section 451. To the contrary, Corral's
attorney established through examination of Corral that the union findings did not address whether
Levi Strauss discharged Corral because she filed workers' compensation claims. Therefore, any
prejudice inherent in the evidence does not substantially outweigh its probative value. 

 Even if the trial court erred in admitting some or all of this evidence, we conclude that it did
not cause the rendition of an improper judgment. The jury had before it substantial evidence that
Levi Strauss discharged Corral pursuant to its medical leave policy. Because the allegedly
inadmissible evidence did not control the judgment, reversal is not required. Finding no abuse of
discretion, we overrule Issue Three.

Other Causes of Action and


1997 Workers' Compensation Claim


 In Issue Four, Corral argues that the trial court erred in admitting evidence of Corral's other
claims of age discrimination, disability discrimination, and retaliation for filing a claim with the
Equal Employment Opportunity Commission. Additionally, she contends that the court should not
have admitted evidence that her 1997 Workers' Compensation claim was found not to be a
compensable injury. As these arguments raise different issues, we will address them separately.

 With the first argument, Corral claims that the court admitted evidence "of Corral's other
claims presented previously in federal court." The evidence to which her brief directs the Court,
however, is not evidence that Corral presented claims in federal court, but rather that she had made
other claims in this case. During cross-examination, counsel for Levi Strauss elicited from Corral
that her live pleadings alleged age discrimination, disability discrimination, and discrimination for
filing a complaint with the EEOC. The questions were limited to the claims Corral had filed in the
instant case, and consequently, the jury heard no evidence that the claims were previously presented
in federal court and decided adversely to Corral. Generally, the scope of cross-examination is broad
and wide-ranging, and a witness may be examined regarding the subject matter of the litigation, his
relationship to the parties, as well as the witness' interest, bias, motives, inclinations, and prejudices. 
Hogue v. Kroger Store No. 107, 875 S.W.2d 477, 480 (Tex.App.--Houston [1st Dist.] 1994, writ
denied); Harrison v. Texas Employers Insurance Association, 747 S.W.2d 494, 498 (Tex.App.--
Beaumont 1988, writ denied). The trial court did not abuse its discretion in permitting Levi Strauss
to cross-examine Corral in this manner.

Denial of 1997 Workers' Compensation Claim


 Counsel for Levi Strauss also questioned Corral about the determination by the Workers'
Compensation Commission that her 1997 injury (the stress-related emotional injury) was not
compensable. Corral argues that the evidence should have been excluded because it lacks relevance
and its probative value is substantially outweighed by the danger of unfair prejudice. Because Corral
only raised a relevance objection in the trial court, we will not address her Rule 403 argument. See
Tex.R.App.P. 33.1(a)(1)(A). In order to prosecute a Section 451.001 suit, the plaintiff must prove
that she filed the Workers' Compensation claim in good faith. Tex.Lab.Code Ann. § 451.001 ("A
person may not discharge or in any other manner discriminate against an employee because the
employee has: (1) filed a workers' compensation claim in good faith."). The determination by the
Commission that Corral's injury was not compensable is relevant to the good faith element of her
claim. Therefore, the trial court did not abuse its discretion in permitting this cross-examination. 
Issue Four is overruled.

EXCLUSION OF EVIDENCE


 In Issue Five, Corral contends that the trial court erred in excluding Plaintiff's Exhibits 77
and 80 which are two letters from Levi Strauss's counsel addressed to Corral's counsel. She argues
that the letters constituted evidence of her return to work status in 1998 and 1999 and demonstrates
Levi Strauss's discriminatory motive and intent. Because the trial court ultimately admitted
Defendant's Exhibit 313, which is a copy of Plaintiff's Exhibit 80, we will only consider whether
the trial court erred in excluding Plaintiff's Exhibit 77.

 Plaintiff's Exhibit 77 is a letter written by Ruben Robles, counsel for Levi Strauss, addressed
to Corral's attorney, Lark Fogel. The letter, dated August 7, 1998, stated as follows:

 I am in receipt of your letter dated July 29, 1998 and the enclosed medicals. As you
know, Ms. Corral is also being treated by Dr. Joseph Neustein for a different injury
than the one referenced in your letter. [Levi Strauss] has previously requested
information regarding restrictions from Dr. Neustein, but have not heard from him
as of this date. They are contacting him again and sending him a copy of Dr. Kaim's
[sic] report. It would not be prudent to attempt to return Ms. Corral to work at this
time until we hear from both of her treating doctors who are treating her for different
injuries. As soon as the Company has Dr. Neustein's report, we will be able to let
you know if [Levi Strauss] will be able to accommodate Ms. Corral with an available
position. In the mean time [sic], her leave of absence is extended pending our search
for clarification on accommodation.


 At the time Robles wrote the letter, Corral had already sued Levi Strauss for discriminatory
treatment under Section 451.001. The letter pertained to the Company's efforts to obtain
clarification from Corral's treating physicians about her ability to return to work and the restrictions
imposed on her. As detailed above in the factual summary, Dr. Keim and Dr. Neustein had provided
conflicting information to Levi Strauss. Corral was terminated by Levi Strauss more than a year later
and she amended her pleadings to allege discriminatory discharge.

 Corral offered Plaintiff's Exhibit 77 for the express purpose of proving that Levi Strauss had
no intention of allowing Corral to return to work but instead engaged in delay tactics until it could
find a way to discharge her. (6) Thus, Corral sought to prove Levi Strauss's motives through the letter
written by its attorney. Levi Strauss objected to admission of this evidence on the ground that
Robles would have been required to testify in order required to explain his intent when he wrote
Plaintiff's Exhibit 77, and in turn, he would have been required to withdraw from representation of
Levi Strauss in the middle of trial. See Tex.Disciplinary R.Prof'l Conduct 3.08, reprinted in
Tex.Gov't Code Ann., tit. 2, subtit. G app. A (Vernon 1998)(prohibiting a lawyer from continuing
employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding
if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an
essential fact on behalf of the lawyer's client). The trial court sustained Levi Strauss's objections
to admission of the letter.

 We find no abuse of discretion in the exclusion of this evidence as it was cumulative of 
substantial evidence already admitted showing Levi Strauss's attempts to obtain clarification from
Corral's doctors and the resulting delay. See Tex.R.Evid. 403. Thus, Corral had evidence from
which she could argue that Levi Strauss intentionally delayed her return to work in order to build a
case against her. Issue Five is overruled. 

 In Issue Six, Corral contends that the cumulative effect of the errors alleged in her first five
issues resulted in an improper verdict. A reviewing court may reverse a lower-court judgment under
the cumulative-error doctrine when the record shows a number of instances of error, "no one instance
being sufficient to call for a reversal, yet all the instances taken together may do so." The University
of Texas at Austin v. Hinton, 822 S.W.2d 197, 205 (Tex.App.--Austin 1991, no writ), quoting
Sproles Motor Freight Lines, Inc. v. Long, 140 Tex. 494, 168 S.W.2d 642, 645 (1943). As we have
found no error committed by the trial court, the cumulative error doctrine does not apply. See
Hinton, 822 S.W.2d at 205. Accordingly, Issue Six is overruled. Having overruled Issues One
through Six, we affirm the judgment of the trial court.



October 2, 2003 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.

1. This committee is composed of representatives from various departments at Levi Strauss, including the
Human Resources Department; Nursing Department; Prevention, Safety and Health Department; and Production
Department. In 1999, a union representative was added to the committee. The committee met weekly to evaluate the
physical requirements of a particular job with each employee's medical restrictions in order to determine whether
accommodations could be made and the employee returned to work without violating medical restrictions. 
2. F.C.E. refers to Functional Capacity Evaluation. 
3. Tex.Lab.Code Ann. § 451.001 (Vernon 1996).
4. UNITE is an acronym for Union of Needletrades, Industrial and Textile Employees, AFL-CIO. 
5. The letter stated: "We have made every effort, but are unable to accommodate your physical restrictions. 
Therefore, we regret to inform you that we have no alternative but to terminate your employment with Levi Strauss &
Co., effective immediately. Please note that an employee who is unable to return to work after a year with or without
accommodation is eligible to apply for employment with the company, if and when we are hiring. We hope you
understand our decision and wish you the best in all of your endeavors. Please feel free to call me with any questions." 

6. At oral argument, Corral's attorney criticized Levi Strauss for not firing Corral sooner. He remarked that Levi
Strauss did not uniformly enforce the medical leave policy because it did not fire Corral immediately upon the expiration
of twelve months, but instead extended her leave for several more months while the company "built its case" against her. 
While it is true that Dr. August's report supports Levi Strauss's conclusion that Corral could not return to work, it is also
true that Levi Strauss would have been required to put Corral back to work if Dr. August had placed less onerous
restrictions on Corral.