George **CISNEROS**, Appellant,

v.

Sonia **DINGBAUM**, Appellee.

No. 08–03–00477–CV.

Court of Appeals of Texas, El Paso.

March 17, 2005.

John L. Williams, El Paso, for Appellant.

Andre C. Poissant, El Paso, for Appellee.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## *OPINION*

DAVID WELLINGTON CHEW, Justice.

This appeal arises from a final order in a suit to establish parentage, in which the

trial court established Appellee Sonia Dingbaum as the parent joint managing conservator with the exclusive right to establish the child's primary residence without regard to geographical restriction, subject to certain conditions and restrictions. In his sole issue, Appellant George Cisneros contends the trial court erred in refusing to restrict the child's domicile to El Paso County, Texas. We affirm.

On October 17, 2000, Mr. Cisneros filed a voluntary paternity action to establish his paternity of M.S.C., f/k/a M.S.D., the child who is the subject of this suit. M.S.C. was born on July 20, 2000. It is undisputed that Mr. Cisneros is the father of M.S.C., nor do the parents contest their status as parent joint managing conservators with Mrs. Dingbaum having the exclusive right to establish the primary residence of the child. Rather, the primary contested issue in hearings before the trial court was Mr. Cisneros' request that the trial court impose a domicile restriction on the child's residence that would limit M.S.C.'s primary residence to El Paso County, Texas.

M.S.C.'s mother, Appellee Sonia Dingbaum f/k/a Sonia Lazaro, was dating both Mr. Cisneros and her future husband Captain Jay Dingbaum when she became pregnant with M.S.C. At the time, Mr. Cisneros was dating Mrs. Dingbaum and his future wife, Monica Cisneros. Mr. Cisneros and Mrs. Dingbaum tried to work out problems in their relationship, but eventually stopped dating early in the pregnancy around December 1999 or January 2000. Mrs. Dingbaum pursued her relationship with Captain Dingbaum and they later married in July 2001. Mrs. Dingbaum believed that Mr. Cisneros was most likely the father of her unborn child, but both Mr. Cisneros and Captain Dingbaum participated in various prenatal activities.

When M.S.C. was born, Captain Dingbaum was named as the child's father on the birth certificate, which Mrs. Dingbaum admitted was a bad decision. Mrs. Dingbaum stated that M.S.C. was given her future husband's last name on the advice of her attorney. In the early months before DNA results were known, Mrs. Dingbaum would bring M.S.C. to Mr. Cisneros' house for visits. Mrs. Dingbaum admitted that if the car of Mr. Cisneros' then-girlfriend Monica was in the driveway or on the street, she would not proceed with the visit. Mrs. Dingbaum conceded that as a first-time mother, she was overprotective with M.S.C., was jealous, and did not show a lot of maturity at that time. Mr. Cisneros' access to M.S.C. was controlled by Mrs. Dingbaum and he continually asked for more time with M.S.C. than the two-hour periodic visits he was provided. Mrs. Dingbaum stated she was trying to do what was best for M.S.C. by following visitation guidelines referred to her by her attorney at the time.

On July 17, 2001, Mr. Cisneros filed a second amended petition requesting temporary orders on joint managing conservatorship, child support, visitation and access, and Mrs. Dingbaum requested the same in a pleading filed the same day. The matter was heard the following day, but the trial court signed its temporary orders on October 1, 2001. The trial court found Mr. Cisneros was the father of the child and ordered a change of name. Mr. Cisneros and Mrs. Dingbaum were named as parent temporary joint managing conservators with Mrs. Dingbaum having the right to establish M.S.C.'s primary residence within El Paso County, Texas. Under the court's order, Mr. Cisneros had a possession schedule of forty-eight hours a week with M.S.C., which included overnight stays, and evidence at the hearings showed that the parties had abided by that

schedule and other court-ordered requirements.[1]

At the March 2002 hearings, Mr. Cisneros testified that he is a business owner in El Paso, and since October 2001, he has been married to Monica Cisneros. He and his wife live with her two sons from a previous marriage. At the time of the hearings, the boys were ages nine and seven. Since M.S.C. was born, Mr. Cisneros took an active role in care-giving responsibilities for the child. Mrs. Dingbaum agreed that Mr. Cisneros was a very hands-on and a very involved parent. She did not dispute that Mr. Cisneros and his wife have a very happy, loving home and that M.S.C.'s relationships with his stepbrothers was loving, significant, and meaningful. She also agreed that the Cisneroses as parents were good and loving people and were very family-oriented. Mrs. Dingbaum agreed that Mr. Cisneros interacts with his son in a meaningful way and that the time M.S.C. has spent with his father has been good for the child. Mr. Cisneros testified that his family in El Paso and particularly his wife's extended family in El Paso gather frequently for get-togethers. Mrs. Dingbaum agreed that M.S.C.'s cousins were wonderful playmates and that she had no reason to believe that M.S.C.'s relationships in the Cisneros extended blended family were nothing but positive, good, and nurturing for M.S.C.

Mrs. Dingbaum met her husband Captain Dingbaum in February 1999 and knew at that time he was a career army officer. Captain Dingbaum is a certified registered nurse anesthetist in the U.S. Army and has been in the military since 1996. Both his parents are nurses in the military, his father is a nurse anesthetist like himself, and he recalled that his family was stationed at a number of bases, including an overseas assignment, while he was growing up. She and Captain Dingbaum married in July 2001 and their son V.D., M.S.C.'s half-sibling, was born in December 2001. Captain Dingbaum testified that there were two locations in El Paso that he could be assigned to and he had already been assigned to both, but was trying to be reassigned back to the other El Paso unit.[2] However, he expected the Army to reassign him to another unit outside of El Paso in June 2002.[3]

Mrs. Dingbaum testified that her husband is an incredible stepfather to M.S.C. and that M.S.C. looks forward to seeing him when he comes home. Captain Dingbaum was continuously supportive of her throughout the pregnancy, with M.S.C.'s birth, and onward. Mrs. Dingbaum is currently a stay-at-home mother. As of the hearing, Mrs. Dingbaum had no intention of going back to work, but rather wanted to devote her time to M.S.C. and infant son V.D. Mrs. Dingbaum informed the court that M.S.C. is very involved in his baby brother's life and they enjoy in-

1. Mr. Cisneros' possession schedule under the temporary orders was: every Sunday beginning at 2 p.m. and ending at 12 noon on the following Monday; every Tuesday beginning at 2 p.m. and ending at 6 p.m.; and every Wednesday beginning at 12 noon and ending at 10 a.m. the following Thursday.

2. Captain Dingbaum's assignment preference form was admitted into evidence at one of the hearings. In the form, Captain Dingbaum noted that because his wife shares custody with the child's father and the child is very

young, it would beneficial for them to be assigned to the El Paso area for as long as possible.

3. In September 2002, while this suit was pending before the trial court, Captain Dingbaum received orders from the military transferring him to Colorado Springs, Colorado. Following a relocation hearing to establish a temporary possession schedule, the Dingbaums moved to Colorado in October 2002.

teracting together. Not taking anything away from M.S.C.'s relationship with his father, Mrs. Dingbaum believed that she, M.S.C., V.D., and her husband had established a family together. If they had to move, Mrs. Dingbaum felt they should go as a family and that separating M.S.C. from her as the primary care-giver would be more devastating for M.S.C. than anything else.

Mrs. Dingbaum agreed that M.S.C.'s relationship with his father is very important, but when asked in her deposition whether her husband's career was more important than that relationship, she stated it was difficult to answer because her husband's career is very important to him. Mrs. Dingbaum believes that her husband's military service is important to him and to their family. She agreed that this goal and dream of his career in the U.S. Army was very much formulated by her husband's life experience and influenced by his family life while growing up. Mrs. Dingbaum admitted that she told Mr. Cisneros' counsel that a discussion with her husband about the possibility of him resigning his commission and moving into the private sector was "not even in the cards." Mrs. Dingbaum believed that her husband's commitment to the military would have a positive impact on M.S.C.'s life. She did not see his service to the country as a negative thing and believes he is a role model for M.S.C.

Given M.S.C.'s bond and attachment to his father, Mrs. Dingbaum believed that their relationship could continue to grow, regardless of the separation, if they maintained quality time together. Mrs. Dingbaum offered a proposed possession schedule dependent upon where they were relocated. If relocated within the United States, M.S.C. could spend two consecutive weeks with Mr. Cisneros, every three months, and within one quarter during the year, he could have three consecutive weeks, not to interfere with specific arrangements for Christmas and M.S.C.'s birthday. When M.S.C. is school-age, Mrs. Dingbaum proposed two uninterrupted months in the summer and the standard possession orders for all other periods of possession. If there was a global relocation, Mrs. Dingbaum suggested that Mr. Cisneros have two, five-week periods separated by three months, not to interfere with specific arrangements for Christmas and M.S.C.'s birthday. Mrs. Dingbaum again proposed two uninterrupted months in the summer and the standard possession orders for other periods of possession when M.S.C. is school-aged. Mrs. Dingbaum also stated she was willing to notify Mr. Cisneros of any plans for return visits to El Paso, which would allow for unscheduled visits with his son.

In addition to the proposed possession schedule, the Dingbaums were willing to assist in maintaining M.S.C.'s relationship with his father by providing videoconferencing on their home computer and telephone contact. They were also willing to have Mr. Cisneros and his family stay with them for visits and to lend them the use of one of their cars while visiting. Mrs. Dingbaum was open to any suggestions to try to help their situation. She was also willing to talk about adjustments to her proposal, but did not think a 50/50 division of time was appropriate for the child or in his best interest.

Mrs. Dingbaum testified that her motive for leaving El Paso was to follow her new family and that keeping the family unit together was very important. She stated that leaving El Paso would be hard for her as well. Mrs. Dingbaum was born and raised in El Paso, loves the city, and considers it her home. Both her parents, her siblings, and her sibling's children still live

in El Paso and they have a close relationship. Mrs. Dingbaum agreed that if it were possible, staying in El Paso County would be in M.S.C.'s best interest given the stability of extended family and the surroundings, however, this was impossible because she would have to follow her husband if he were relocated.

Mrs. Dingbaum testified that it would not be in M.S.C.'s best interest to be separated from her and that, as his mother, she is nurturing and has an instinctual bond with the child. She did not believe that the good relationship that M.S.C. has with his father would be harmed if they were to leave El Paso, but that separating the child from her would be devastating for him. In Mrs. Dingbaum's opinion, Mr. Cisneros could do all the things he has been doing as a good father under the proposed possession schedule.

Mr. Cisneros testified that he was not asking for custody, but rather he wanted equal access to M.S.C. and to have the child's primary residence restricted to El Paso for a number of reasons. Mr. Cisneros believed that it was important to the parent-child relationship that a parent be there for the child's firsts, like riding a bike, teaching him to swim, or to be kind-all the things that a parent might miss if that parent was not there. He did not think he or M.S.C. should miss out on being with each other for these milestones in the child's life. Mr. Cisneros stated that the longer periods of possession in the temporary orders have made a huge difference in his relationship with his son. They have been able to enjoy their time together, including the experience of bedtime rituals with the overnight stays.

Mr. Cisneros agreed that Mrs. Dingbaum is a good mother and that she loves M.S.C. as does he. He did not want to separate M.S.C. from his mother or his baby brother V.D. and thought that her family should be kept intact, but also believed that he was M.S.C.'s family as well. Mr. Cisneros did not think it would be possible to continue the type of relationship that M.S.C. deserves to have with his father and with his mother if M.S.C. was allowed to leave with Mrs. Dingbaum. In Mr. Cisneros' opinion, M.S.C. deserves to have his father and his mother in his life on a daily, weekly, and monthly basis, that is, he needs to have them there for him all the time. Mr. Cisneros desired that he, Mrs. Dingbaum, and M.S.C. live in the same city so that they can each enjoy raising M.S.C. and M.S.C. can enjoy both his parents. Mr. Cisneros was certain that any periodic visits between him and M.S.C. would be full of quality time, but that M.S.C. deserved more than that. Mr. Cisneros has much to offer and teach M.S.C., but he doubted that he would be able to instill some of those values if M.S.C. does not live with or near him. His biggest fear was that some day M.S.C. would ask why he did not spend more time with his father and whether it was because his father did not love him.

Mr. Cisneros' only complaint against Captain Dingbaum was that his career choice was going to greatly impact his relationship with his son. In Mr. Cisneros' opinion, Captain Dingbaum was making a choice to be in the military and that he was not enslaved to it. He believed that Captain Dingbaum's dream of being in the military was being put above M.S.C.'s right to have both his parents in his life. Mr. Cisneros felt there was no reason that Captain Dingbaum should have to move away when he has the ability to choose any job he wants in the private sector. Mr. Cisneros suggested that Captain Dingbaum could serve his country by joining the reserves or the national guard and still live in El Paso. Mr. Cisneros admitted stating in his deposition that Captain Dingbaum

was being selfish by putting his career ahead of M.S.C.'s relationship with his father.

As already noted, Captain Dingbaum is a certified registered nurse anesthetist in the U.S. Army. While in college, Captain Dingbaum gained an interest in the health-care field. His first job was in Tampa, Florida at a veteran's hospital and after that, he decided to join the U.S. military and was assigned to San Antonio, Texas. He was then stationed in Hawaii for eighteen months before moving to El Paso, where he was assigned to William Beaumont Medical Center. Captain Dingbaum expected two or more moves during the remainder of his career. He agreed that literature from the Army about the health-care field informs enlistees that they can expect multiple assignments and probably at least one tour of duty outside the continental United States. Captain Dingbaum is on active duty and has been in the military for close to six years. Because of the education he has received while in the military, he owed the U.S. Army an obligatory payback period until January 2003. Captain Dingbaum did not think his five years served would count towards retirement if he never returned to any type of military service.

Captain Dingbaum's nursing background includes prior experience in telemetry, critical care nursing, and intensive-care nursing. He is licensed as a certified registered nurse anesthetist in Texas and in Georgia. He is certified in the areas of advanced cardiac life support and pediatric advanced life support. Captain Dingbaum agreed that nurse anesthetists are in high demand in the private sector, but he did not know what was available in El Paso. He did not know of any career scenario where an anesthesia practicing nurse would go back to practicing telemetry or intensive care unit nursing. According to

Captain Dingbaum, there is a demand in the active duty for certified registered nurse anesthetists in the U.S. Army. He finds the job to be significant and very relevant. Captain Dingbaum did not know what the demand was for certified registered nurse anesthetists in the reserves. He did not know if he could serve in the reserves in El Paso because this depends upon the number of available slots for certified registered nurse anesthetists.

Captain Dingbaum admitted that in his deposition he stated he did not want to resign his commission because he enjoyed serving in the army, enjoyed the opportunities the Army provides him, enjoyed the pride he feels when wearing the uniform, and enjoyed the comradery of his coworkers. Captain Dingbaum felt devoted to both his family and to his service and was proud that both he and his parents were serving in the armed forces. Captain Dingbaum agreed that the goals of his family, the best interest of M.S.C., stability, continuity of family relationships, and maximizing M.S.C.'s time with both parents, are achieved more conveniently by staying in El Paso. However, he and his wife believed that these goals could also be met with him serving in the Army. Captain Dingbaum stated that they were going to try to maintain M.S.C.'s relationship with his father and he felt that the relationship will still be good for M.S.C. He was firm that avoiding physical separation from the immediate Dingbaum family was in M.S.C.'s best interest and that they could maintain the father-son relationship with him still serving in the Army. Captain Dingbaum's interactions with Mr. Cisneros have been pleasant, civil, and conversational. Captain Dingbaum respects Mr. Cisneros as a father and believed he could communicate to Mr. Cisneros the progress issues that concerned Mr. Cisneros during those periods of separation between M.S.C. and his father.

Hector Escobar is an executive medical recruiter with DM Dickason Personnel Services in El Paso. Mr. Escobar specializes in recruiting nurses, registered nurses, certified nurses, physical therapists, radiation therapists, and other technical positions in the health and medical field. Mr. Escobar deals with all the medical facilities and hospitals in the area and based on Captain Dingbaum's credentials, he would classify him as one of the most marketable applicants. Mr. Escobar testified that Captain Dingbaum's status as a certified registered nurse anesthetist is very sought after and that he would be considered a very qualified candidate. Being very conservative, Mr. Escobar believed that Captain Dingbaum would qualify for at least 900 positions currently available in the nursing field in the area. Captain Dingbaum earns $43,000 working full-time in the Army. According to Mr. Escobar, Captain Dingbaum could earn at least $60,000 working full-time in the private sector. On cross-examination, Mr. Escobar did not know how many openings there were in El Paso for comparable work in Captain Dingbaum's specialty. However, he believed that if he presented Captain Dingbaum as a job candidate at any area hospital, within twenty-four hours Captain Dingbaum would be working with any of those institutions.

At the hearings, two psychologists, Dr. Karen Gold and Dr. Luis Natalicio, testified as experts in child psychology, the psychodynamics of parent-child relationships, and child development. Dr. Gold had been contacted in this case to provide a bonding assessment with respect to M.S.C. and his father. Dr. Gold observed the child with his father on a few occasions, but had not personally met Captain Dingbaum or Mrs. Dingbaum nor did she observe M.S.C. with the Dingbaums. In their first meeting in July 2001, Dr. Gold had a general discussion with Mr. Cisneros about effective parenting and child development issues. She recalled that the father and child were very close and that she observed a great deal of nonverbal communication of mutual affection.

The second meeting was on February 5, 2002. M.S.C. was about sixteen or seventeen months old and he was obviously getting over a cold and not feeling very well. M.S.C. was clingy with his father, but did not cry. He appeared very receptive to his father talking to him about his not feeling well. Dr. Gold thought Mr. Cisneros was very caring and comforting with M.S.C. Mr. Cisneros informed Dr. Gold that for approximately seven months, he had greater access to M.S.C. M.S.C. was seeing his father five days a week and things were going very well.

On February 12, 2002, Dr. Gold observed M.S.C. with his father, stepmother, and two stepbrothers. M.S.C. was having a wonderful time with the two boys and she observed an extremely healthy interaction between the children. M.S.C. was engaging all the adults with the toys and equally apportioned his time with his father and stepmother in showing them items from the toy box. Based on her observations, it was Dr. Gold's opinion that Mr. Cisneros is a very devoted, very focused father. At no time did he denigrate M.S.C.'s mother or the importance of the mother's role. Based on deposition testimony, it was Dr. Gold's opinion that in terms of M.S.C.'s relationships with his mother and his father, neither of the parents is the singular, primary parent in the child's life.

Dr. Gold criticized the work of Dr. Judith Wallerstein which is based on older psychological research espousing the concept of primary parents and a primary bond to the mother. Dr. Gold stated there was no empirical scientific support for

Wallerstein's claims that a child's relationship with the mother is the central protective factor in the child's future adjustment and development. Rather, it is important that the child have a very appropriate and healthy access to both parents. Dr. Gold stated it was in a child's best interest to have access to as many healthy, loving role models and nurturing figures as possible. In Dr. Gold's opinion, Wallerstein and some of her colleagues are gender biased and do not give adequate importance to the role that fathers play in their children's moral and emotional development. Dr. Gold stated that literature shows that at every age, a child will gain something from contact with each parent, whether the child is an infant, toddler, or school-aged.

Dr. Gold disagreed with Wallerstein's notion that relocation is fine even if the non-relocating parent does not see the child frequently because the quality of visits is what is important, not the quantity. In Dr. Gold's view, what often happens is that the non-relocating parent has an unnatural relationship with the child by trying to build in as many pleasurable activities as possible so as not to have any less of the child's experiences with him. Unless there was an extremely compelling reason otherwise, Dr. Gold believed that the quantity of time needs to be equal in addition to having excellent quality time.

Dr. Luis Natalicio testified about his observations of M.S.C., his mother, and stepfather during a recent visit to their home and generally about current relevant literature on child psychology. Dr. Natalicio recalled that the interaction between M.S.C. and his mother was very consistent with securely attached children and their parent or parents. He disagreed with Dr. Gold's conclusion that there was no primary caretaker in this particular case. Dr. Natalicio stated that the literature is

very clear that there is a primary caretaker role. The primary caretaker is the base for the child-he or she is the person to whom the child has a secure attachment or bond. Based on his understanding from testimony and documents he reviewed, Mrs. Dingbaum and Mr. Cisneros did not succeed in forming a family unit during M.S.C.'s gestation and separated. From that point on, Mrs. Dingbaum had Captain Dingbaum's support and love for the balance of the pregnancy to the present. When M.S.C. was six months old, Mrs. Dingbaum and Captain Dingbaum formed a family unit, moved in together with M.S.C., had a child, V.D., and according to Dr. Natalicio, this family unit contains the elements of attachment that one would expect to find in a child that is developing normally, appears to be content, and in all likelihood will continue in a healthy adjustment and developmental path.

In Dr. Natalicio's opinion, historically M.S.C. has a primary secure attachment to his mother, which extends to his father. In explaining his opinion, Dr. Natalicio stated that Mr. Cisneros is bonded to this child because the child already had a secure bond with his mother, who is the one that provides the child with the security and sense of safety available for the child to go forward and relate to others in the world. Dr. Natalicio denied that his conclusion about the primary caretaker in this case was based on gender. He did not believe that women were uniquely suited to rear children. Attachment had nothing to do with gender, but rather had to do with primary caretaker relationships.

Dr. Natalicio had no disagreement with Dr. Gold's opinion regarding the lack of empirical support for Dr. Wallerstein's opinions and he agreed that the vast majority of researchers in the field agree that Wallerstein's sample was a limited one and her conclusions were overreaching. With

regard to Wallerstein's idea that when a primary caretaker is secure, the child is secure, Dr. Natalicio explained that this result does not necessarily follow. However, what does follow is the inverse, that is, when the primary parent is distressed, there is a much greater likelihood that the child will be distressed. According to Dr. Natalicio, there is empirical research that clearly indicates that a distressed parent is unlikely to be able to maintain an adequate adjustment for a child who is bonded to that parent. In this sense, the well-being of the parent is critical to that child's development.

Dr. Natalicio agreed that ideally balanced access to both parents is in the best interest of a child if the parents are not in conflict and are separated, but are able to cooperate with one another. He agreed that absent contrary evidence, equal access to both parents was a worthwhile ideal, but in reality, our society was far from a situation where fathers take on 50 percent of the responsibility of child-rearing. Dr. Natalicio disagreed with Dr. Gold's opinion on the quantity versus quality of time issue with respect to contact between a child and non-custodial parent. According to Dr. Natalicio, the literature clearly shows that quality is what counts in the non-custodial parent-child relationship, not the frequency of contact. Frequency of contact, in itself, does not promote secure attachment between the child and his father. However, the quality of a father's interaction with the child is an extremely strong predictor of the child-father security attachment. Dr. Natalicio agreed that accessibility needs to be on a regular basis, which is the function of a visitation plan.

Dr. Natalicio agreed that interaction with extended family is desirable as long as they are in fact positive role models and as long as the child is flowing into those relationships from a secure base of attach-ment. He agreed that stability and continuity with such an extended family would be in a child's best interest provided that the child was in the environmental familial situation in which the parent to whom the child is attached is also present. In Dr. Natalicio's opinion, it is not a question of where the child goes, rather it is whether the child is with the parent to whom the child is securely attached.

From the literature, Dr. Natalicio believed that when attachment is disturbed, there can be adjustment difficulties for children. Children are resilient, but disruptions in the secure attachment pose one of the greatest threats to their normal development. Dr. Natalicio stated that research in child development indicated that M.S.C. is coming into a rather critical period of time when more discipline comes to bear on his behavior because a child is learning to develop some self-control. A healthy transition through that development depends on the secure attachment with the parent. For instance, consistency of the attachment allows for transition to take place without imposing shame and creating doubt in the psychological make-up of the child during toilet training. Dr. Natalicio therefore believed that in this way, M.S.C.'s age and developmental stage factored into the relocation issue. Since M.S.C. and his father are attached and there is a visitation plan, Dr. Natalicio believed that the quality of their relationship could continue and lead to good adjustment for the child.

Following the hearings, the trial court entered a final order in which it determined that Mrs. Dingbaum had the exclusive right to establish the primary residence of the child without regard to geographical restriction subject to certain conditions and restrictions set forth below. The order provides:

### Geographic Area for Primary Residence

SONIA DINGBAUM shall have the right to establish the primary residence of the child without regard to geographic restriction so long as she remains married to JAY DINGBAUM and is living with JAY DINGBAUM. If SONIA DINGBAUM's marriage to JAY DINGBAUM ends by death or divorce, or if SONIA DINGBAUM no longer lives in the locale of the base where JAY DINGBAUM is stationed, then the primary residence of the child, [M.S.C.], shall revert to El Paso County, Texas. If any of the events should occur which would result in a change in the primary residence of the child to El Paso County, Texas SONIA DINGBAUM IS ORDERED to immediately and forthwith notify GEORGE CISNEROS, in writing, of such occurrence and SONIA DINGBAUM shall, within a reasonable length of time, not to exceed three months, return the child to El Paso County, Texas to reside with her or to reside with GEORGE CISNEROS, if SONIA DINGBAUM does not immediately return to El Paso, Texas to take up residence.

In addition to the above, IT IS FURTHER ORDERED that if SONIA DINGBAUM is not residing with JAY DINGBAUM because JAY DINGBAUM has been deployed by the U.S. military to an assignment which does not permit his family to accompany him or if SONIA DINGBAUM opts not to accompany her husband for any reason, *and* if the deployment is of a duration of 12 or more consecutive months, then SONIA DINGBAUM shall, within a reasonable amount of time, not to exceed three months, return the child to El Paso County, Texas to live with her or with GEORGE CISNEROS, if SONIA DINGBAUM does not return to El Paso County to reside. In this regard, if at the time of the deployment, or any time thereafter, JAY DINGBAUM knows or has reason to know that the deployment will be of a duration of 12 or more consecutive months, the obligation of SONIA DINGBAUM to return the child to El Paso County shall be triggered at that time and *not* at the expiration of the 12 month period.

IT IS FURTHER ORDERED that at such time as JAY DINGBAUM returns from this deployment, SONIA DINGBAUM shall have the option to reunite with JAY DINGBAUM and reside with the child in the locale of the base where JAY DINGBAUM is next stationed.

IT IS FURTHER ORDERED that SONIA DINGBAUM shall provide written notice to GEORGE CISNEROS within 72 hours of learning of a deployment that will separate her from JAY DINGBAUM. This notice will include the expected duration of the deployment, if that information is known to either SONIA DINGBAUM or JAY DINGBAUM, and shall be accompanied by copies of any written orders or notices from the United States military with respect [to] the effective date of the deployment and, if applicable, the expected duration of the deployment.

Upon request, written findings of fact and conclusions of law were prepared and filed. Pertinent to this appeal, the trial court found:

- that M.S.C. born July 20, 2000 is the child of Mrs. Sonia Dingbaum and Mr. George Cisneros and that the parties acknowledged that M.S.C. is bonded to each parent;

- that after M.S.C. was born, Mrs. Dingbaum married her husband, Captain Jay Dingbaum and on December 13, 2001, had a child, V.D.;

- that after M.S.C. was born, Mr. Cisneros married his wife, Monica Cisneros and that at no time were Mr. Cisneros and Mrs. Dingbaum living together;
- that the parties and their respective families unquestionably love M.S.C. and provide excellent care for him when he is in their respective care;
- that the parents' abided by the court's visitation schedule during the pendency of this cause and that experts of each party testified that it was important for M.S.C. to have quality contacts with his father in order to continue further the bonding with his father;
- that Captain Dingbaum was ordered transferred by the United States Army to report to Colorado Springs, Colorado; that he has been in the Army since 1996, is a nurse anesthetist; that he and his family were to leave El Paso, Texas on October 22, 2002, in order for him to report for duty on time;
- that Mrs. Dingbaum stated she would be leaving El Paso, Texas, with her husband because she wanted to keep her family together; that she felt this was in M.S.C.'s best interest; that she stated she would do whatever she could to help M.S.C. bond with his father and she agreed to additional visitation for Mr. Cisneros and his son; that Captain Dingbaum stated that he would assist Mr. Cisneros in arranging for live "video conferencing" of M.S.C. with his father in order to promote their relationship as well, even on a nightly basis;
- that Mr. Cisneros acknowledged that he did not desire to separate M.S.C. from his mother nor from his brother, V.D.

In its conclusions of law, the court determined:

- that it reviews and considers this cause as a Suit Affecting the Parent–Child Relationship governed by the Texas Family Code;

- that since the court was not asked to rule on the issues of conservatorship, the court finds that it is in the best interest of the child that the parties continue as joint managing conservators of the child, with Mrs. Dingbaum, designated as primary care-giver having the right to determine the residence of the child subject to the court's restrictions;

- that the court finds it is in the best interest of the child that Mrs. Dingbaum, may determine the child's primary residence without regard to geographic location subject to the court's restrictions; that the court based this decision on the conduct of the parties, the order of the United States Army received by Captain Dingbaum, the statement by Mrs. Dingbaum that she would continue to do whatever she could to help M.S.C. bond with his father, Mr. Cisneros, and the offer of Captain Dingbaum to arrange "video conferencing" between Mr. Cisneros and his son;

- that the court finds it is in the best interest of the child that since the child is not being restricted to El Paso, Texas, that a non-standard possession and access order should be entered; that the court finds that a non-standard visitation order is an appropriate mechanism to maintain and strengthen the bond between Mr. Cisneros and his son as well as grant periods of possession of the child at least as similar as possible to those provided by the standard possession order; that the court further finds that a non-standard visitation order is an appropriate mechanism to lessen the effects of travel on the child; in arriving at this decision the court has taken into account: the age of the child, the circumstances of the parties, the needs of the parties, and the best interest of the child;

- that the court finds it is in the best interest of the child that Mr. Cisneros will have phone contact with his son at particular dates and times in order to maintain and build his bond with his son;
- that the court finds that it is in the best interest of the child that Mr. Cisneros will have more visitation time with his son than called for by the Standard Possession Order in order to help maintain and build his bond with his son; that the court finds that it is in the best interest of the child that Mr. Cisneros will have a longer summer vacation than normal in order to help maintain and build his bond with his son;
- that the court finds that it is in the best interest of the child that when Mrs. Dingbaum travels to El Paso, Texas, Mr. Cisneros with limited exceptions will be entitled to additional possession times with his son during specified periods of time and days.

### DOMICILE RESTRICTION

In his sole issue, Mr. Cisneros contends the trial court erred in not restricting M.S.C.'s residence to El Paso County, Texas and that it refused to impose a domicile restriction based on evidence that M.S.C.'s stepfather desired to hold employment outside El Paso County. Mr. Cisneros asserts that the trial court did not properly apply the mandated state policy of assuring frequent and continuing contact and did not properly evaluate M.S.C.'s best interest.

### Standard of Review

■ A trial court's order regarding conservatorship is reviewed under an abuse of discretion standard. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to any guiding princi-

ples. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record. *Bates v. Tesar*, 81 S.W.3d 411, 424 (Tex.App.-El Paso 2002, no pet.); *Jenkins v. Jenkins*, 16 S.W.3d 473, 477 (Tex.App.-El Paso 2000, no pet.). Thus, an abuse of discretion does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *Bates*, 81 S.W.3d at 424–25; *Jenkins*, 16 S.W.3d at 477.

■ Once it has been determined that the abuse of discretion standard applies, an appellate court should engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *Franco v. Franco*, 81 S.W.3d 319, 333 (Tex.App.-El Paso 2002, no pet.); *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex.App.-El Paso 1998, no pet.).

### Burden of Proof

■ On appeal, Mr. Cisneros argues that the burden of proof in the context of relocation litigation in an original proceeding should be on the party seeking to relocate. He asserts that unlike a modification suit, when a domicile restriction is litigated in the first instance, neither party has the burden to prove a change in circumstances. *See Bates*, 81 S.W.3d at 424 (burden of proof on moving party in modification suit given absence of legislatively imposed statutory presumptions in relocation cases). Mr. Cisneros contends that in these cases, the burden should be on the party whose action or desired action contravenes or compromises the state's public

policy in favor of children's frequent and continuing contact with parents. We agree that the burden of proof enunciated in *Bates* does not apply to this case, but differ in our reasoning.

The best interest of the child is always the primary consideration of the court in determining issues of conservatorship, possession of and access to a child. *See* TEX. FAM.CODE ANN. 153.002 (Vernon 2002). In Texas, it is presumed to be in a child's best interest for his parents to be appointed joint managing conservators. *See* TEX. FAM.CODE ANN. 153.131(b). It is the public policy of this state to assure that children have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, and to encourage parents to share in the rights and duties of raising their children after the parents have separated or dissolved their marriage. *See* TEX.FAM.CODE ANN. 153.001(a).

In this case, the parents' status as joint managing conservators is not at issue. Both parties sought affirmative relief from the trial court with regard to its determination of M.S.C.'s best interest on issues related to their conservatorship. In order for the trial court to conduct an appropriate best-interest analysis in this case, the parties both needed to present evidence in support of their position on the child's best interest. In this regard, both parties carry the burden of introducing sufficient evidence for the trial court to make its decision on the best interest of the child. *See, e.g., Lide v. Lide,* 116 S.W.3d 147, 152 (Tex.App.-El Paso 2003, no pet.)(once burden of producing evidence to rebut joint managing conservatorship presumption is discharged, evidence is then evaluated as it would be in any other case, and the presumption has no effect on the burden of persuasion). Therefore, we disagree that our state's public policy in favor of fre-

quent and continuing contact necessarily places a burden on Mrs. Dingbaum to prove that there should not be a domicile restriction. Rather, the best interest of the child remains the primary consideration of the court in determining issues of conservatorship, possession, and access to a child, including any relocation issues litigated in an original proceeding. We observe that there is nothing in the record to indicate the trial court erroneously placed a higher burden on one party over the other in determining the relocation issue.

### Best Interest of the Child Analysis

■ Mr. Cisneros' primary contention on appeal is that the trial court based its decision solely on Captain Dingbaum's desire to continue his employment in the Army and not on the child's best interest as required under the Texas Family Code. He claims that the only reason the trial court allowed M.S.C. to relocate outside of El Paso was his stepfather's pursuit of his military career. Mr. Cisneros argues that in this case, the stepparent's desires were permitted to override a joint managing conservator's right to frequent and continuing contact with his child and the child's right to frequent and meaningful contact with both parents.

The Texas Family Code provides that:

(b) In rendering an order appointing joint managing conservators, the court shall:

(1) designate the conservator who has the exclusive right to determine the primary residence of the child and;

. . .

(B) specify that the conservator may determine the child's primary residence without regard to geographic location.

TEX.FAM.CODE ANN. 153.134(b)(1)(B)(Vernon Supp.2004–05).

The statute is silent as to the specific factors that the trial court should consider when determining whether a domicile restriction is in the best interest of the child. The Texas Supreme Court in *Lenz v. Lenz* provided courts some guidance in applying our state's best-interest standard in the relocation context. *See Lenz v. Lenz,* 79 S.W.3d 10, 13–16 (Tex.2002). The *Lenz* Court highlighted various relevant factors considered in other jurisdictions which may assist Texas courts in determining a child's best interest in relocation cases, including: the reasons for and against the move; the effect on extended family relationships; the effect on visitation and communication with the non-custodial parent to maintain a full and continuous relationship with the child; the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the non-custodial parent and child; the nature of the child's existing contact with both parents, and the child's age, community ties, and health and educational needs. *See Lenz,* 79 S.W.3d at 15–17; *see also Bates,* 81 S.W.3d at 434 (listing additional factors courts of other jurisdictions have considered in the specific context of relocation litigation). However, the *Lenz* Court clearly stated that suits affecting the parent-child relationship, such as this case, are intensely fact-driven and consequently involve balancing numerous factors in the court's particular best-interest analysis. *Lenz,* 79 S.W.3d at 18–19; *see also Franco,* 81 S.W.3d at 340 (evidentiary review in relocation cases is inherently fact specific).

Here, the trial court specifically found that Mrs. Dingbaum would be leaving El Paso, Texas with her husband because she wanted to keep her family together and that she felt that this was in M.S.C.'s best interest. Evidence from the hearings shows no bad-faith or ill motive on the part of Mrs. Dingbaum for desiring to leave the El Paso area. Rather, Mrs. Dingbaum testified that relocation would be hard for her given her good relationships with extended family in El Paso. The trial court found that the parties and their respective families provide love and excellent care to him and that M.S.C. is bonded to each parent. Based on testimony from Mrs. Dingbaum and Captain Dingbaum, the trial court found that Mrs. Dingbaum would do whatever she could do to help M.S.C. bond with his father, including agreeing to additional visitation, and that Captain Dingbaum would assist Mr. Cisneros in arranging for live video conferencing in order to promote their relationship. Evidence at the hearings supports these findings.

The court also concluded that it was in the best interest of M.S.C. to allow Mr. Cisneros more visitation than called for by the standard possession order. Since the child was not being restricted to El Paso, the court concluded that a non-standard possession order be entered based on its findings that such an order was an appropriate mechanism to maintain and strengthen the parent-child bond, and to grant periods of possession as similar as possible to those provided by the standard possession order. Evidence regarding the quality and nature of Mr. Cisneros' relationship with his son, M.S.C.'s age and developmental needs, and expert testimony on the need for quality interaction clearly supports the trial court's conclusion.

On appeal, Mr. Cisneros specifically takes issue with the particular wording of the trial court's limited restriction on Mrs. Dingbaum's right to establish the primary residence of M.S.C. According to Mr. Cisneros, the trial court restricted the child's domicile to El Paso only if Captain Dingbaum is not in the military, if Mrs. Dingbaum is not living with him, or if Captain Dingbaum's deployment requires

him to be away from his family for twelve months or more. Mr. Cisneros notes that the variety of scenarios addressed in the limited domicile restriction are all based on Captain Dingbaum and his assignment with the U.S. Army.

However, after reading the court's order on the geographic area for primary residence in context, we find that Mr. Cisneros' interpretation unduly shifts the focus away from the party whom the court sought to place the restrictions and conditions upon—that is, Mrs. Dingbaum. In the court's findings, it specifically found that it was in the best interest of M.S.C. that Mrs. Dingbaum be designated as primary care-giver having the right to determine the residence of the child subject to the court's restrictions. There is evidence in the record to support this finding. The order provides that Mrs. Dingbaum has the right to establish the primary residence of the child without regard to geographic restriction unless certain events occur in her relationship with Captain Dingbaum that would trigger the stated restrictions. Under the various Dingbaum family separation scenarios, Mrs. Dingbaum still remains the designated primary care-giver when the child's primary residence reverts to El Paso County. The order only requires the child to reside with Mr. Cisneros if Mrs. Dingbaum fails to return to El Paso to take up residence within the time period specified in the order.

In fashioning its order, it is clear that the trial court balanced numerous best-interest factors including the nature of the new Dingbaum family unit, the rich and nurturing extended family relationships in El Paso, and Mr. Cisneros' undisputed testimony that he did not desire to separate M.S.C. from his mother or his baby brother. We conclude that the trial court had sufficient information upon which to exercise its discretion. Further, we conclude the trial court made a reasonable decision based on the evidence presented, it did not act in contravention to the state's public policy of assuring frequent and continuing contact, nor did it otherwise err in its application of its discretion in this case. We overrule Mr. Cisneros' sole issue and affirm the trial court's final order.