YVONNE T. RODRIGUEZ, Justice
In two issues, Appellant, Isaias Martinez ("Father") appeals the trial court's determination of conservatorship for his minor child: N.V.M. The divorce decree named both parents as joint managing conservators of the child but gave Appellee, Laura Gonzalez ("Mother"), the exclusive right to designate the child's primary residence. Father argues: (1) it was not in the best interest of the child to appoint Mother and Father as joint managing conservators; and (2) it was not in the best interest of the child to designate Mother as the joint managing conservator with the exclusive right to designate the primary residence of the child. We affirm.
BACKGROUND
Father and Mother were married on February 14, 2008. N.V.M. was born prior to their marriage on August 16, 2007. Father filed for divorce on August 10, 2010. A final hearing was held on April 28, 2014. At the final hearing, the only issue before the trial court was the possession and conservatorship of the child. At the time of the hearing, the child lived with Mother.
1. The Psychotherapist
Dr. Enrique Reyes was first to testify at the hearing. Dr. Reyes, a psychotherapist specializing in hypnotherapy and educational psychology, explained he had been in practice approximately forty years. Dr. Reyes had evaluated the child and Father. In evaluating Father, Dr. Reyes concluded that he was "normal" and that "[n]o psychological *511 problems were indicated." In evaluating N.V.M., Dr. Reyes concluded that the child needed a lot of help and, while he could not say that the child was cognitively challenged, the child was developmentally delayed. Dr. Reyes told the trial court he believed Father is capable of raising the child. Dr. Reyes did not evaluate Mother.
2. Other Witnesses
Rebecca Santillan, whose son attended karate lessons with N.V.M., testified that she knew Father, Father's parents (N.V.M.'s paternal grandparents), Mother, and N.V.M. Santillan stated she often offered to give N.V.M. rides home from karate lessons or from school. Mother, however, repeatedly declined Santillan's offers. N.V.M. informed Santillan that his Mother warned him not to communicate with Santillan. When asked about N.V.M.'s hygiene, Santillan stated N.V.M. told her that he "doesn't shower often and that [Mother] doesn't have time to do the laundry." In addition, N.V.M. told Santillan that a change of clothes was only allowed after showering.
Santillan explained that during monthly outings with the karate group and Father, N.V.M. would begin crying and asked not to go home with Mother. On one occasion, Santillan was called from N.V.M.'s school when the school was unable to contact Mother since she, not Father or N.V.M.'s paternal grandparents, had been placed on the emergency contact list.
Nancy Gaucin, Mother's cousin, also testified. Gaucin asserted she was testifying "to do what's right for the child." Gaucin was aware of the N.V.M.'s sickness claims at school, however, was unaware of an incident when N.V.M. was placed in a wheelchair. Gaucin believed Mother met with N.V.M.'s teacher each time Mother picked the child up from school but knew Mother met with the teacher every three weeks for parent-teacher conferences.
Gaucin stated Mother and N.V.M. spent a lot of time together. During Gaucin's interactions with N.V.M., the child was bathed, clean, and wore different clothes. Mother and N.V.M. attended church together weekly with Gaucin and Gaucin was unaware of any claims involving Mother and witchcraft. In addition, she stated that an electrical malfunction caused the fire at Mother's residence. Gaucin had not seen the child interact with Father, however, she had previously seen Father smoke marijuana.
3. The Parents
Mother also testified at the hearing. She and N.V.M. lived with Mother's mother, who then had cancer. Mother worked as a housekeeper, cleaning the house across the street from her residence. She worked 9:00 a.m. to 2:00 p.m., Monday through Friday, and was paid minimum wage. She had been fired from her previous employer for Family and Medical Leave Act (FMLA) violations. In addition, she had been charged with assault after an altercation with Father and, as a result, was taking anger management classes.
Mother explained a "tea candle" caused the fire at her home. Mother explained that the fire had been ruled an accident. She also denied any allegations that she engaged in any sort of witchcraft. Mother acknowledged Santillan had been called to pick N.V.M. up from school when the school was unable to reach her. Mother explained she was unavailable because she was at the doctor with her mother. She also took N.V.M. to the doctor when she found out N.V.M. was vomiting on purpose at school. N.V.M. was not sick and the doctor informed Mother that the child's conduct could be a result of the divorce proceedings and circumstances. In addition, *512 Mother believed the only way to explain why N.V.M. ended up in a wheelchair at school was because N.V.M. had previously seen Mother dislocate her knee. Mother denied that N.V.M. defecated himself.
Mother believed under an agreement with the school, which both she and Father signed, Father was not allowed to be on the emergency contact list. She stated that Santillan offered to give the child a ride once and denied Santillan's suggestion that the child had poor hygiene, explaining that the child bathed daily and wore a uniform to school. Mother visited with the N.V.M.'s school teacher several times a week and understood that his reading abilities needed improvement. She explained that she loved her son. She and N.V.M. read every day, cooked together, in addition to a variety of other activities. While she did not have much money, she nevertheless makes the best of their time together. She did not understand why Father was petitioning for sole custody and explained that in doing so, Father would turn N.V.M. against her. Mother stated that N.V.M. informed her that there is a lack of discipline at Father's house and that they "let [N.V.M.] do whatever."
Mother further testified that she did not prohibit N.V.M. from calling Father or Father's parents, however, they never answer when they "see [her] number." Mother denied ever physically harming the child despite several inquiries from CPS and explained that when disciplining the child, they have a conversation. Mother was unaware why N.V.M. had bumps on his head on an occasion when Father took N.V.M., and each of the CPS cases involving N.V.M. had been closed. She testified that Father was not current on his child support payments.
Father testified that he was seeking sole possession of the child and, in the alternative, the right to designate the child's primary residence should the trial court appoint them both as joint managing conservators. He was a medical assistant working for several eye doctors and was in the process of getting a real estate license. Father lived in Canutillo and explained that he had a room available for N.V.M. at his home.
Father stated that Mother's sister had informed him that Mother was "into witchcraft" which included different candles and oils and he once saw the candles and oils when visiting Mother's house. In addition, Father testified Mother had hit him. After he told Mother he was seeking a divorce, Mother struck him on the head and he was taken to the hospital by a neighbor.
Father testified that he understood N.V.M. was underperforming at school. He "guarantee[ed]" that if he was granted primary or sole custody, he would be able to devote more attention to support N.V.M.'s education. He visited with N.V.M.'s teacher along with visiting school administrators. Father stated N.V.M. likes sports and karate helped his attitude and personality. Father knew N.V.M. was absent from school, had been tardy several times, and had made several visits to the nurse's office. Father also stated he was current on his child support payments.
DISCUSSION
In two issues, Father complains the trial court abused its discretion when it entered the final decree of divorce. First, Father argues the trial court erred by failing to appoint him as joint managing conservator with the right to designate the child's primary residence. Second, Father asserts the trial court erred by failing to appoint him as the sole managing conservator of the child.
*513 A. Standard of Review
We review a trial court's judgment concerning conservatorship for an abuse of discretion. Gillespie v. Gillespie , 644 S.W.2d 449, 451 (Tex. 1982). A trial court's primary consideration when determining conservatorship of a child is the best interest of the child, and it has wide latitude when making that determination. Id. ; Bell v. Campbell , 328 S.W.3d 618, 620 (Tex.App.-El Paso 2010, no pet.) ; see also TEX.FAM.CODE ANN. § 153.002 (West 2014). A trial court abuses its discretion when it acts arbitrarily and unreasonably or without reference to any guiding principles. Bell , 328 S.W.3d at 620. Upon determining that the abuse-of-discretion-standard applies, we engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? Id.
A trial court is best situated to observe the demeanor and personalities of witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record. Bell , 328 S.W.3d at 620, (citing Cisneros v. Dingbaum , 224 S.W.3d 245, 257 (Tex.App.-El Paso 2005, no pet.). "If some evidence of a substantive and probative character exists to support the trial court's decision, no abuse of discretion has occurred." [Citations omitted]. Bell , 328 S.W.3d at 620.
B. Sole Conservator and Primary Residence
The trial court determined the issues of conservatorship and the child's primary residence after a bench trial for the dissolution of Father and Mother's marriage. Father contends the trial court abused its discretion by failing to appoint him as the sole managing conservator or joint managing conservator with the right to designate the primary residence of the child. He asserts the evidence failed to show that appointing him as sole conservator, or conservator with the right to designate the child's primary residence would significantly impair the child's physical health or emotional development. Further, the evidence demonstrated that it was in the child's best interest to appoint him as sole managing conservator or joint managing conservator with the right to designate the child's primary residence.
The trial court appointed both parents as joint managing conservators and appointed Mother as the conservator with the exclusive right to designate the primary residence of the child. With regard to possession and access to the child, the trial court entered the following in the Final Decree of Divorce:
Beginning May 9, 2014, mother/Respondent will have possession of the minor child until Friday, May 16, 2014, at 6:00 p.m. The parents will then alternate weeks of possession. The parent not in possession will have possession on Wednesday after school until Thursday when the child is returned to school. All exchanges will be done at school with the parent to take possession at school and drop off at school. If school is not in session, then the parent taking possession will pick up the child at 6:00 p.m., at the other parent's home. Holiday possession will be pursuant to the Standard Possession Order.
Sole Managing Conservator
Father's sole conservator argument rests on the rebuttable presumption that appointing the parents of the child as joint managing conservators is in the best interest of the child. TEX.FAM.CODE ANN. § 153.131(b) (West 2014). It is within the trial court's discretion to determine the possession and access to the child when it *514 appoints the parents as joint managing conservators. See TEX.FAM.CODE ANN. § 153.134. Father, who sought to be appointed sole managing conservator of the child, bore the burden to rebut the statutory presumption that a joint managing conservatorship was in the best interest of the child. Lide v. Lide , 116 S.W.3d 147, 152 (Tex.App.-El Paso 2003, no pet.).
Father argues Mother "failed to offer or present any evidence of specific actions or omissions on the part of [Father] which demonstrated that granting [Father] custody of [the child] would significantly impair the child's physical health or emotional development; in the alternative, there was evidence presented of [Mother's] inability to protect the physical and emotional well-being of [the child]." We find no basis in Father's assertion that the record is devoid of any evidence to support the appointment of joint managing conservators. It was Father's burden to overcome the presumption that appointing the parents as joint managing conservators was in the best interest of the child. Lide , 116 S.W.3d at 152.
Father testified he had a stable job, was prepared and able to provide for N.V.M. He had met with N.V.M.'s teacher and school administrators, understood that N.V.M. was underperforming academically, and had health issues at school. In addition, Father testified regarding the assault involving Mother and his belief that Mother was "into witchcraft."
Santillan's testimony concerned N.V.M.'s hygiene, the emergency at school, and her interactions with N.V.M. during karate classes and outings. Gaucin's testimony concerned her impetus in seeking the best outcome for N.V.M., her knowledge of his health issues at school, Mother's interactions with his teacher, and his hygiene. While Santillan testified N.V.M. had poor hygiene, Gaucin testified to the exact opposite: N.V.M. had good hygiene. In addition, Gaucin testified that she was unaware of any claims of witchcraft, in fact, she told the court Mother and the child attended church together. The psychotherapist's testimony addressed N.V.M.'s developmental and academic issues. He evaluated N.V.M. and Father, stating that he believed Father was capable of raising N.V.M. He did not, however, evaluate Mother.
Mother disputed much of the testimony presented by Father and some of the testimony provided by the other witnesses. She denied allegations N.V.M.'s hygiene was poor, allegations that the child self-defecated, and denied any witchcraft practices. Mother testified she is employed and the fire at their home was accidental. She also met with N.V.M.'s teacher and understood the child's academic underperformance and health issues, explaining that, after seeking medical attention for the child, the child's health concerns at school were likely the result of the pending divorce. She and the child were bonded, Mother expressed concern in not having access to the child. She admitted to the assault and has been taking anger management classes.
The evidence showed that while Mother had her challenges in parenting, she was making progress and she was supportive of the child's emotional, physical, and psychological needs. Based on this record, there was sufficient information to allow the trial court to find that Father did not overcome the presumption that joint conservatorship was in the best interest of the child. As such, the trial court did not abuse its discretion by appointing Father and Mother as joint managing conservators and we overrule Appellant's first issue.
Exclusive Right to Determine Primary Residence
In challenging the trial court's order granting Mother the exclusive right to *515 determine the child's primary residence, Father points to Mother's failure to provide evidence and Mother's inability to protect the physical and emotion well-being of the child. As seen above, however, the testimony regarding Mother's care for N.V.M. was equivocal. Santillan stated that N.V.M.'s hygiene was poor while Gaucin stated it was not. Father stated Mother engaged in witchcraft practice while Gaucin and Mother denied it. In addition, Father and Mother, while agreeing on some of the events that led up to the divorce, presented equivocal testimony regarding N.V.M.'s care. For example, while Father testified he was current on his child support payments, Mother testified he was not. Additionally, while Father insinuated the fire was caused by candles that Mother used for witchcraft, Mother stated she did not engage in witchcraft practices.
The trial court was in the best position to observe the demeanor and personalities of the witness and able to " 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." Bell , 328 S.W.3d at 620. We defer to the trial court's determination regarding the credibility of the witnesses. Based on the evidence above, the trial court was presented with sufficient information to reasonably conclude that it was in the child's best interest that Mother be given the exclusive right to determine the child's primary residence. We, therefore, find no abuse of discretion and overrule Appellant's second issue.
CONCLUSION
We affirm the judgment of the trial court.
Hughes, J., Not Participating